[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. Nature of Proceedings
Felicia S. was born on December 29, 1986, to Kathleen S. (hereinafter "the respondent" or "mother") and an unknown father. Following the filing of a neglect proceeding in this court on April 4, 1987, Felicia was adjudicated as uncared for by agreement of the parties on June 9, 1987, and the court committed her to the Department of Children and CT Page 4309-A Youth Services (hereinafter "petitioner," "DCYS" or "the Department") for a period of up to eighteen months (R. Walsh, J.). The court extended this commitment twice, first on November 18, 1988 (Noren, J.) and again on April 20, 1990 (Axelrod, J.). On October 8, 1991, the court (Teller, J.) revoked the commitment by agreement and entered an order of protective supervision for six months, effective October 20, 1991, permitting Felicia to return to the respondent's custody subject to certain terms and expectations.
On January 17, 1992, following an incident, described infra, involving Felicia's sister Janelle, the Department moved to modify that disposition by converting it back to a commitment. That motion was never addressed by the court.
On April 16, 1991, Janelle D. was born to the respondent mother.[1]
On January 15, 1992, petitioner filed a neglect petition in the interest of Felicia and coterminous petitions CT Page 4309-B in the interest of Janelle. On that date, the court (Teller, J.), granted the petitioner's application for an ex parte order of temporary custody. On February 26, 1992, upon the agreement of all the parties, the court (Teller, J.) adjudicated both Janelle and Felicia as neglected children, committed Janelle to the petitioner for a period of up to eighteen months and permitted Felicia to return to the respondent's home subject to an eighteen-month period of protective supervision. The petition to terminate mother's parental rights to Janelle was withdrawn without prejudice.
Among the terms of the February, 1992 order of protective supervision was one which ordered the respondent not to allow any man into her residence without obtaining advance approval by DCYS. Based on an alleged violation of this order, the court (Teller, J.) entered a new ex parte order of temporary custody on April 10, 1992. That same day, the petitioner moved to reopen and modify the disposition of Felicia's neglect adjudication and to have her committed to the Department.
On May 22, 1992, the Department filed the petitions CT Page 4309-C which are the subject of this Memorandum of Decision, seeking the termination of the respondent's parental rights to both Felicia and Janelle. Following various pretrial proceedings, trial was commenced on the petition on January 11, 1993 and continued on January 15, January 19, January 21, February 5, and March 1, 1993. The parties were given until April 8, 1993 to file trial briefs, and until April 16, 1993 to file reply briefs, if desired.
The general authority of the Superior Court to terminate parental rights is now found in Connecticut General Statutes 17a-112 (b), which provides, in pertinent part, as follows:
 The superior, court upon hearing and notice . . . may grant such petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . with respect to any non-consenting parent, [the CT Page 4309-D circumstances giving rise to the need for termination have existed] over an extended period of time, which, except as provided in subsection (c) of this section, shall not be less than one year.
A termination petition implicates fundamental constitutional rights. Our Supreme Court discusses some of these rights in the case of In Re Jessica M., 217 Conn. 459
(1991), where the court, at pages 464, 465 and 466, stated in part as follows:
 Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that "undeniably warrants deference and, CT Page 4309-E absent a powerful countervailing interest, protection." Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); see also In Re Juvenile Appeal (83-CD), 189 Conn. 276, 295, 455 A.2d 1313 (1983) (noting that "it is both a fundamental right and the policy of this state to maintain the integrity of the family"). Termination of parental rights does not follow automatically from parental conduct justifying the removal of custody. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents CT Page 4309-F retain a vital interest in preventing the irretrievable destruction of their family life." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
. . .
 As a matter of statutory fiat, consideration of the best interests of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination. In re Barbara J., 215 Conn. 31, 45, 574 A.2d 203 (1990); In re Luis C., 210 Conn. 157, 165, 554 A.2d 722 (1989); In re Juvenile Appeal, (Anonymous), supra, 177 Conn. 671-72; see also O. Ketcham and R. Babcock, "Statutory Standards for the Involuntary Termination of Parental CT Page 4309-G Rights," 29 Rutgers L. Rev. 530, 539 (1976). We have observed, however, that "(i)nsistence upon strict compliance with the statutory criteria before termination of parental rights and subsequent adoption proceedings can occur is not inconsistent with concern for the best interests of the child." In re Juvenile Appeal (Anonymous), supra, 177 Conn. 672. A child, no less than a parent, has a powerful interest in the preservation of the parent-child relationship. Santosky v. Kramer, supra, 760.
These are all concerns which a trial court must bear in mind in hearing and deciding termination petitions.
In a proceeding for termination of parental rights, the petitioner must prove a ground alleged in the petition by CT Page 4309-H clear and convincing evidence. In re Theresa S., 196 Conn. 18
(1985). The petitioner seeks termination regarding both Felicia and Janelle based on Connecticut General Statutes17a-112 (b)(2), which provides for termination when:
 . . . the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child . . .
The petition regarding Janelle also alleges the grounds set forth in Connecticut General Statutes17a-112 (b)(3) and (4).
17a-112 (b)(3) provides for termination when: CT Page 4309-I
 The child has been denied by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well being . . .
 17a-112 (b)(4) provides for termination when:
 . . . there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interests of the child. CT Page 4309-J
For reasons discussed in greater detail in section IIB, infra, the petition regarding Felicia, which accompanies the earlier petition resulting in her adjudication as a neglected child, is construed as being a "coterminous" petition filed pursuant to 17a-112 (e).
If the petitioner meets its burden, the court must then decide whether termination of parental rights is in the best interest of the child, and in doing so, the court must consider and make findings in writing of the six factors set out in Connecticut General Statutes 17a-112 (d). Because, with regard to Janelle, the petitioner acknowledges that the grounds for termination have existed for less than one year, the court must also find, under the totality of circumstances, that a waiver of the "one-year rule" is necessary to promote Janelle's best interest. If the court decides it is in the best interest of the child to terminate parental rights, the petition should be granted and the petitioner appointed the statutory parent of the child. The court does not consider the "child's best interest" unless CT Page 4309-K grounds for termination have been proven by clear and convincing evidence.
The adjudication on the petition may consider facts as of the last day of filing or amending the petition, which in this case is May 22, 1992. In deciding the disposition, the court may consider facts as of the last date of trial, in this case March 1, 1993, including those facts contained in the mandatory social study. In re Juvenile Appeal, 192 Conn. 254
(1984).
Where coterminous petitions are filed under17a-112 (e) of the Connecticut General Statutes, as is the case with Felicia, the court is normally required to proceed in three separate stages as follows:
A. Adjudication of the Neglect/Uncared for Petition
The court must determine, by a fair preponderance of the evidence, if the child has been neglected or uncared for as of the date the petition was filed or last amended. CT Page 4309-L In this case, however, although the child is no longer committed to the Department, uncared for and neglect adjudications have already been entered. The disposition of the uncared for petition has expired, but an order of protective supervision following the neglect adjudication is still in effect.
B. Adjudication of the Termination Petition
The court must next determine whether the evidence provides clear and convincing evidence that any pleading ground exists to terminate the parent's rights as of May 22, 1992. If no such ground is found, the court would normally return to the neglect/uncared for petition to consider an appropriate disposition. In this case, there is already a disposition, namely a period of protective supervision. The petitioner, however, has previously moved to reopen that disposition and to modify it to one of commitment, and that motion has not yet been decided. Thus, if grounds for termination are not found to have been by clear and convincing evidence, the court would turn to a CT Page 4309-M resolution of the petitioner's Motion to Reopen and Modify Disposition.
If at least one ground to terminate is found, however, the court must move to the third stage.
C. Disposition of Both Petitions
With Felicia having already been adjudicated as neglected, if grounds are found to terminate parental rights, the court must then consider whether the facts as of the last day of the hearing, in this case, March 1, 1993, establish after consideration of the six factors enumerated in17a-112 (d) of the Connecticut General Statutes, that such termination is in the child's best interest. If the court does not find that the child's best interest would be served by terminating the parent's rights, it must return to, and dispose of, the Motion to Reopen and Modify Disposition regarding Felicia's neglect adjudication. If the court does find that termination serves the child's best interest, an order should issue terminating the respondent's rights and CT Page 4309-N appointing the Commissioner of the Department of Children and Youth Services as statutory parent.
II. Preliminary Issues
At the outset of the trial, the respondent moved to dismiss the termination of parental rights petition relating to Felicia, claiming that the court lacked subject matter jurisdiction. In addition, she moved to suppress any and all statements made by her to the Norwich Police Department on or after May 13, 1992, as well as any derivative evidence flowing from such statements, based in part on her claim that the statements made on May 13, 1992 were given prior to the receipt of her Miranda warnings. Miranda v. Arizona,384 U.S. 436 (1966). Because the first of these motions implicated subject matter jurisdiction and, hence, the right of the court to proceed further with the case, and because the second motion raised the issue of whether Miranda and its exclusionary rule are applicable to child protection proceedings, the court addressed these matters as they arose, delivering an oral decision from the bench denying both CT Page 4309-O motions. Because both motions raised interesting and complex issues and because all counsel provided the court with excellent memoranda of law and oral argument, the court indicated that it would incorporate its rulings on these motions into its written Memorandum of Decision.
A. Motion to Dismiss.
The respondent moved to dismiss the petition to terminate her parental rights regarding Felicia S. in accordance with Connecticut Practice Book 142 et seq., claiming that the court lacked subject matter jurisdiction in three respects. First, she claimed, the petition alleged that the child is committed to the custody of DCYS, whereas in fact, Felicia S. was not, at the time of the petition, a committed child. Second, she claimed that the only ground cited as a basis for terminating parental rights was the respondent's failure to rehabilitate, a ground which she asserts is not included in Connecticut General Statutes45a-717, the statute which she claims to be the only basis for so-called "coterminous" petitions. Finally, she claims CT Page 4309-P that the petition alleges that the ground of failure to rehabilitate has existed for a period of greater than one year, which, she asserts, cannot in fact be the case in light of the fact that the termination petition followed the neglect adjudication by only three months.
Although the instant motion was filed after the commencement of trial, and assuming, arguendo, that the basic rules of civil practice apply to child protection proceedings in the Superior Court for Juvenile Matters, see In re Baby Girl B., 224 Conn. 263, 281-2 (1992), the motion, contrary to the petitioner's arguments, is not untimely. The motion, by its terms, implicates subject matter jurisdiction, an issue which the parties are not free to waive, intentionally or otherwise. U.S. Trust Company v. Bohart, 197 Conn. 34, 39,495 A.2d 1034 (1985).
Asserting a lack of subject matter jurisdiction and establishing it are two different things, however, and in the latter respect, the respondent's motion fails. The respondent's argument hinges on its claim that the petitioner CT Page 4309-Q has proceeded against her with respect to her child Felicia as though that child were committed to the Department, whereas, as is conceded by all the parties, she is not.
It is true that Felicia has been committed to the Department in the past, and that her commitment has been twice extended. That commitment was revoked, however, on October 8, 1991, and protective supervision was substituted. Although the petitioner subsequently moved to reopen and modify that disposition and to substitute an order of commitment, the court never acted upon that motion and that order of protective supervision lapsed on April 20, 1992. Prior to the expiration of the first order of protective supervision, however, a second neglect petition was filed, resulting in a superseding order of protective supervision for eighteen months, an order which is still in effect. DCYS has moved to modify this disposition as well, and its motion is still pending. Thus, at all times pertinent to the resolution of the issues raised in the Motion to Dismiss, Felicia was not a committed child.
The basis of the motion to dismiss is that on Form CT Page 4309-R JD-JM-40 Rev. 4-91, the Judicial Department's form for petitions for the termination of parental rights, in the section designated "Jurisdiction Based on", the petitioner has checked the box next to the phrase, "Child Committed to the Custody of the Commissioner of the Department of Children and Youth Services. (Gen. Stat. 17a-112)", rather than the box next to the phrase "Neglect Petition Accompanied by Petition for Termination of Parental Rights (Coterminous Petitions) (Gen. Stat. 17a-112)". If this were all the petitioner had done to invoke the court's jurisdiction, the respondent's point might be well taken. Such clerical defects as this, however, are of no moment if it is clear from the pleadings that the court's jurisdiction is correctly invoked. See In re Michael M., 29 Conn. App. 112, 119-120
(1992). In this case, the balance of the form petition makes it abundantly clear that the petitioner seeks to invoke the court's jurisdiction based on its claim that it is seeking the termination of the respondent mother's parental rights to a child who is not committed to the Department.
Specifically, the balance of the petition alleges, CT Page 4309-S in pertinent part, that the respondent's parental rights should be terminated "in the best interests of the child and for the following reasons as provided by CGS 45a-717 and17a-112: . . . 3. The child has been found in a prior proceeding to have been neglected or uncared for. The mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child . . . . The above-mentioned reason has existed for not less than one year . . ."
Connecticut General Statutes 17a-112 (e) provides that a neglect/uncared for petition "may be accompanied by a petition for termination of parental rights filed in accordance with this section with respect to such child, notwithstanding that such child has not been committed to the Commissioner of Children and Youth Services." Such a petition is commonly termed a "coterminous" petition, meaning that it shares a common boundary or boundaries with the neglect/uncared for petition. The American Heritage Dictionary, Second College Edition: Houghton Mifflin CT Page 4309-T Company, Boston, 1985. Although it is frequently the practice of the petitioner to file neglect/uncared for and termination of parental rights petitions simultaneously, the statute does not, by its terms, require simultaneous filing. Rather, the statute states only that a neglect/uncared for petition "may be accompanied by" a termination petition.
"In construction of a statute, words and phrases shall be construed according to the commonly approved usage of the language. . ." Connecticut General Statutes 1-1(a), Pintavalle v. Valkanos, 216 Conn. 412, 416 (1990). The American Heritage Dictionary, Second College Edition, defines "accompany" as "1. To go along with; join in company. 2. To supplement; add to. 3. To coexist or occur with; to perform an accompaniment to." Thus, neither "accompany" nor "coterminous" imply that the two petitions must both start and end at the same time.
Consistent with both definitions, this petition for termination of parental rights joins, supplements and goes along with the earlier uncared for petition. They share a CT Page 4309-U common boundary in that the disposition of the underlying uncared for petition is to be resolved at the same time that the termination of parental rights petition is adjudicated and disposed of. In this case in particular, where the petitioner seeks to reopen and modify the previous disposition in the uncared for petition, the two petitions resemble even more closely the classic coterminous petitions which result in simultaneous dispositions of both.
The respondent claims, however, that even assuming that the instant petitions may be considered as "coterminous", the grounds alleged for termination, namely failure to rehabilitate, are not included in Connecticut General Statutes 45a-717, which she asserts to be the statute that authorizes coterminous petitions. See In Re Kelly S., 29 Conn. App. 600, 615, n. 6 (1992). That statute, however does not even mention coterminous petitions. Rather, it is 17a-112 (e) which specifically authorizes the filing of accompanying petitions and it specifically refers to the grounds recited in 17a-112 (b), which, of course, includes 17a-112 (b)(3), failure to rehabilitate. To ignore CT Page 4309-V these references, as respondent urges us to do, defies all basic rules of statutory construction.
The reference in 17a-112 (e) to the court's granting the petition for termination of parental rights "as provided in 45a-717", the linchpin of respondent's claim, is admittedly somewhat puzzling. It is best viewed as akin to the other references in 17a-112 (e) to the notice and hearing requirements provided in 45a-716 and 717. It is thus the general process of hearing and determination described in Title 45a, rather than the specific grounds for termination of parental rights, that is the subject of 17a-112 (e)'s reference to that title. In order to find the grounds for the granting of the "accompanying" or coterminous petition authorized by 17a-112 (e), the reader of the statute is specifically and directly referred to 17a-112 (b), and that specific reference trumps the more general hearing and determination process described in 45a-717.
In short, the far more logical reading of17a-112 (e) is that it incorporates all of the grounds CT Page 4309-W contained in subsection (b) of that section. This interpretation is also far more consistent with the overall purposes of the entire body of child protection legislation. Basically, 45a-717 is the basic termination of parental rights law for Probate Court. 17a-112 is the basic statute for committed children, but it also provides a vehicle for termination in the case of children on whose behalf neglect and uncared for petitions are pending. Where the court still has jurisdiction over such a petition which has already resulted in an adjudication, with or without a commitment, failure to rehabilitate may therefore be grounds for termination of parental rights.
The respondent cites two trial court decisions that appear to have reached contrary results. In In re Kathleen R., Superior Court for Juvenile Matters at Montville, (February 4, 1991), this court (Terence Sullivan, J.) held that the ground of failure to rehabilitate "is applicable only in those cases where the child is currently committed to the custody of the Commissioner of the Department of Children and Youth Services." Id. at 23. It should be noted, CT Page 4309-X however, that unlike the present situation, there was no adjudication in effect at the time of the filing of the termination of parental rights petition in Kathleen R. Id. at 22. Judge Sullivan does not explain why it is the absence of a commitment, rather than adjudication, that renders failure to rehabilitate as an impermissible ground for termination, and he also suggests that the issue is not significant one in that case, noting in a footnote that the petitioner would not have been able to prevail on this issue anyway, based on his finding that termination was not in the child's best interest. In light of the fact that the child in that case was not even adjudicated, the conclusion that the ground of failure to rehabilitate is not a valid basis for termination is best viewed as dictum.
The respondent also cites this court's decision in In re William H., et al, No. N-91008 and N-91009, Superior Court for Juvenile Matters at Montville, (January 10, 1992), in which the court (R. Walsh, J.) found that failure to rehabilitate was not a valid ground for termination in a case where the Department had withdrawn a petition to extend a CT Page 4309-Y commitment and allowed the then existing commitment to expire with court approval, subsequently closing its own file. Id. at 14, 15. This action by the Commissioner implicitly recognized that the respondents had achieved the requisite degree of personal rehabilitation so that DCYS involvement was no longer needed. Significantly, Judge Walsh placed considerable emphasis on DCYS' "closing of their file on December 6, 1990, without even a request for protective supervision". (emphasis added) In this case, an order of protective supervision was in effect at the time of the filing of the petition to terminate respondent's parental rights.
The change from a disposition of commitment to the Department to one of protective supervision is not tantamount to a presumption of rehabilitation. It is a recognition of progress in that direction, but nothing more. Indeed, DCYS' petition for revocation filed on September 6, 1991, spoke in terms of "marked improvement . . . responsive to suggestions by foster mother . . . generally kept appointments for routine medical exams . . . has usually been cooperative in permitting CT Page 4309-Z [the visiting nurse] to see Felicia and the baby . . . has made substantial gains in her ability to parent and her willingness to accept assistance . . ." To the extent that there is any presumption to be derived from the existence of an order of protective supervision, it is that personal rehabilitation has not yet been totally achieved.
With reference to the "one year requirement," by virtue of the overlapping orders of protective supervision, this court has maintained jurisdiction over Felicia's case since the filing of the original uncared for petition in 1987. The petitioner is, therefore, in position to argue that the conditions giving rise to the petition for termination of parental rights, namely the failure to have achieved personal rehabilitation, have existed since the original uncared for adjudication on June 9, 1987, a period of more than one year. That allegation is consistent with the original uncared for adjudication and existing neglect adjudication, the prior commitment and the current protective supervision status.
For all of these reasons, the Motion to Dismiss is CT Page 4309-AA denied.
B. Motion to Suppress.
Respondent moved to suppress a statement allegedly made by her to Investigator Bundy of the Norwich Police Department on May 13, 1992. This claim is in part based on an alleged failure to advise respondent of her Miranda rights, Miranda v. Arizona, 384 U.S. 436 (1966), and in part based on her claim that, under all of the circumstances, her alleged confession was not voluntary. Additionally, on a "cat-out-of-the-bag", U.S. v. Bayer, 331 U.S. 532, 540
(1947), or "fruit of the poisonous tree", Wong Son v. U.S.,31 U.S. 471 (1963) theory, she moves to suppress any evidence of subsequent repetitions of that statement by the respondent or of evidence derived from it.
To prevail on her claim that her statement should be suppressed because she was not advised of her Miranda rights, the respondent would first have to prove that she was subjected to a custodial interrogation. State v. Vitale, 197 CT Page 4309-BB Conn. 396, 409 (1985); State v. Copeland, 205 Conn. 201, 207
(1987). Thereafter, the State would have the burden of proving that adequate warnings were given and that the waiver of her rights was constitutionally valid. State v. Gray,200 Conn. 523, 531-33 (1986); State v. Weidenhof, 205 Conn. 262,267 (1987). In this case, however, as a threshold matter, it must be determined whether or not Miranda applies at all to statements sought to be used not in a criminal proceeding, but rather in a child protection proceeding.
Although conceding that this is not a criminal case, respondent nonetheless urges the court to view it as "quasi-criminal", arguing that statutes and court rules regarding termination cases require that respondents be advised of certain rights, such as the right to counsel and the right to remain silent, which are traditionally associated with criminal proceedings. It is also true, as argued by the respondent, that the standard of proof in a termination of parental rights case is higher than that in civil cases (including the preponderance of the evidence standard utilized in neglect and uncared for petitions), but CT Page 4309-CC it is less than the reasonable doubt standard associated with criminal cases.
It is, however, clear that a termination of parental rights case is not a criminal case, but rather a civil case, and attempting to apply the term "quasi-criminal" does not truly advance the discussion. Our Supreme Court has effectively rejected all argument that child protection cases are anything other than civil cases. In re Baby Girl B., supra, at 282.
Additionally, in In re Steven G., 210 Conn. 435,440 (1989), the Supreme Court observed that "the state has a parens patriae interest in preserving and promoting the welfare of the child (citations omitted), which makes a juvenile proceeding fundamentally different from an adult criminal trial."
A significant purpose of the criminal justice system is to punish the guilty. The purpose of child protection proceedings, however, is by definition to protect CT Page 4309-DD children. Although a parent whose child has been committed to DCYS or whose parental rights have been terminated may feel punished, that result is purely ancillary to the fundamental purpose of protecting children. And, although the criminal justice system may have some role to play in protecting the public and the rights of individuals, its primary purpose is to adjudicate and punish the guilty. Thus, we begin this analysis with the proposition that the instant petition is a civil proceeding and that it is not a criminal proceeding.
No case has been found that holds "that, the constitutional right against self-incrimination, a right in criminal prosecutions, extends as a matter of constitutional law to parents in juvenile proceedings . . ." In re: Carl O.,10 Conn. App. 428 (1987). To this court's knowledge, there is only one reported decision in this or any other state directly addressing the question of whether Miranda should apply to statements sought to be introduced in child protection proceedings, and that decision gave the matter short shrift. In In re Sherelle W., et al, Superior Court CT Page 4309-EE for Juvenile Matters at New Haven (August 7, 1989), 7 Conn. Family Law Journal 4, pp. 64-67, the court (Downey, J.) held that "issues regarding Miranda warnings may be relevant with regard to admission of evidence in a criminal proceeding but have no bearing on the admissibility of evidence in a coterminous hearing." Presumably because the court felt that even without the challenged statements "there was more than ample evidence that the said children had more than once been found unattended while in mother's care and custody", that court did not feel the need to explain its holding in detail. Because, however, the issue in this case was raised as a threshold matter before the court had the opportunity to examine the respondent's statements in the context of all the evidence, a more detailed analysis of the law is required here.
The purpose of the Miranda rule, requiring that certain warnings be given to an individual prior to the commencement of custodial interrogation, as well as the rule of exclusion that prohibits the introduction of testimony or evidence concerning statements made by a suspect who has not CT Page 4309-FF been "Mirandized", is to deter unlawful police actions in the conduct of criminal investigations.
Respondents have offered no support in the cases of this or any other state for the assertion that statements of a person who has not been "Mirandized" may not be used in connection with a child protection proceeding. The basis of their argument is that a termination of parental rights case has consequences in many ways as devastating as those of a criminal case and that we should therefore treat this case like a criminal prosecution and hold Miranda applicable.
The petitioner argues that judge-made exclusionary rules are not fundamental constitutional rights in and of themselves, but rather were designed for the specific purpose of deterring police misconduct. U.S. v. Calandra, 414 U.S. 338
(1974), State v. Brown, 199 Conn. 47 (1986). While in Calandra, the United States Supreme Court declined to extend the exclusionary rule to grand jury proceedings, it and other courts have also held the rule not to apply in a variety of civil proceedings. See, e.g., U.S. v. Janis, 428 U.S. CT Page 4309-GG 433 (1976) (Internal Revenue Service); INS v. Lopez-Mendoza,468 U.S. 1032 (1984) (immigration).
Moreover, in this case, the child protection proceedings in which exclusion of the evidence is sought do not fall within "the offending officer's zone of primary interest." U.S. v. Janis, supra, at 458. Here, Investigator Bundy testified that he was investigating a criminal matter and did not think that he would ever be called upon to offer evidence in the Superior Court for Juvenile Matters. See also Governing Board of Mountain View School District v. Metcalf, 36 Cal. Ap. 3rd 546,11 Cal.Rptr. 724 (1974); Stedronsky v. Sobol, 572 N.Y.S.2d 445, 447
(1991).
Courts in New York and California have expressly considered the applicability of the exclusionary rule to child protection proceedings. In In the Matter of Diane P.,494 N.Y.S.2d 881 (1985), the New York court rejected application of the exclusionary rule because "the state's overwhelming interest in protecting and promoting the best CT Page 4309-HH interests and safety of minors in the child protection proceeding far outweighs the rule's deterrent value. Id. at 884.
 A child abused by a parent is bereft of any refuge and is perhaps the most helpless and powerless of victims, betrayed by the very person to whom he or she would most naturally turn for succor. We deal here not with theoretical quibbles over abstract social concepts, but with the urgent plight of those who most need the protective hand of the State. We also emphasize that the effects of applying the exclusionary rule in a child protective proceeding would potentially be immeasurably more devastating than is true of the typical criminal prosecution. Normally, in a criminal prosecution, CT Page 4309-II if application of the rule prevents the conviction of a guilty person, the result will be that a past crime goes unpunished. It is a price society has been willing to pay to prevent unwarranted intrusions upon person or property. Here, however, if application of the rule leads to an erroneous finding that there has been no abuse, the result may be to condemn an innocent child to a life of pain and fear or even to death. (citations omitted). Where the result would be so abhorrent, utilization of a rule normally intended to provide protection from illegal police activity is not justifiable.
Id. at 884.
See also Stedronsky v. Sobol, supra. CT Page 4309-JJ
Finally, the court in In re Diane P. noted that "the deterrent effect of the exclusionary rule will be adequately served by precluding the use of the evidence in any related criminal proceeding. Id. at 885. See also In re Cassandra R., 504 N.Y.S.2d 603 (1986); In re Christopher B.,147 Cal.Rptr. 390, 82 Cal.App. 3rd 608 (1978); In the Matter of Robert P., 132 Cal.Rptr. 5, 12, 61 Cal.App. 310
(1976).
It is true that these cases discuss the exclusionary rule in the context of Fourth Amendment searches and seizures rather than in the context of Miranda and the Fifth Amendment right against self-incrimination. Despite the absence of child protection cases construing Miranda, however, and in the absence of any cases supporting the respondent's argument, this court finds the search and seizure analogy persuasive. The court therefore holds that the respondent's statements, as well as any subsequent repetitions of those statements and/or evidence derived from them, are not inadmissible merely because her initial CT Page 4309-KK statements were not "Mirandized".
This is not the end of the inquiry, however, as the respondent also claims that her statements should be excluded because they were not voluntary. Independent of her Miranda and Fifth Amendment rights, an individual has a due process right to prevent the use, at least in a criminal trial, of an involuntary confession. Oregon v. Elstad, 470 U.S. 298,306-307 (1985); State v. Shifflett, 199 Conn. 718, 727
(1986). See also Matthews v. Eldridge, 424 U.S. 319 (1976).
The fundamental question in determining voluntariness is: "Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of this confession offends due process." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973); State v. Stankowski,124 Conn. 121, 132 (1981). A determination of whether the statement was voluntary depends on the totality of the CT Page 4309-LL circumstances, including the mental capacity of the person making the statement, the length and location of the questioning and the circumstances surrounding it.
In this case, although it is undisputed that the respondent is intellectually limited, this court finds her statement voluntary. At the request of Investigator Bundy, she accompanied her friend, Melva Vocatura, to the Norwich Police Department. She arrived with Ms. Vocatura at approximately 1:00 p. m. and waited for about two hours while Bundy interviewed Vocatura. Bundy began to interview the respondent at about 3:00 p. m. At 4:40 p. m., she told him that she was responsible for Janelle's injuries by picking up the baby, suspending her by her feet and swinging her around and then losing her grip, causing the baby to fly outward and land on the floor. Bundy then advised her of her Miranda rights and reduced her statement to writing. After being again advised of her Miranda rights, the respondent signed the statement. Although mother testified that she did not feel free to leave, Bundy testified that she was free to leave, and, in fact, she did leave after signing her CT Page 4309-MM statement. The court finds no credible evidence that she was in any way threatened or coerced by Bundy. Nothing in the circumstances surrounding her giving Bundy her statement, including her limited intellectual capacity, suggests that her statement was involuntary.[2] Based on this court's view that Miranda is inapplicable in a child protection proceeding, and based also on its conclusion that, independent of Miranda, mother's statement to Officer Bundy was voluntary, the Motion to Suppress must be denied.
III. Findings of Fact
A trial was conducted on the instant petitions on January 11, 15, 19 and 21, February 5 and March 1, 1993. The petitioner introduced testimony and exhibits through the following witnesses: Susan Wax, DCYS social worker; David Swett, DCYS Care Line worker; Detective William Bundy, Norwich Police Department; Daniel G. Fisher, M.D., pediatrician at the Pediatric Critical Care Program of Hartford Hospital; Karen R, Felicia's foster mother; Roseanne Fantacci, mother's next door neighbor; Micheline CT Page 4309-NN P, Janelle's current foster mother; and Carol Sharp, DCYS social worker.
The respondent mother introduced evidence and testimony through the following witnesses: Melva Vocatura, mother's friend; Margaret Simon, "foster grandparent"; Denise Beplat, counselor at ABC Counseling, Norwich; Geri S, mother's sister; and the respondent herself. By way of rebuttal, the petitioner recalled DCYS social worker Carol Sharp.
Based on testimony by DCYS social workers Susan Wax and Carol Sharp, the court finds that DCYS has been involved with mother for approximately six years. A case had been opened in March of 1987 following Felicia's hospital admissions, including admissions for failure to thrive. An order of temporary custody (OTC) was granted by the Court on April 7, 1987 and vacated on April 22. A new OTC was obtained on May 13, 1987, and Felicia was committed to DCYS on June 9, 1987 because of mother's inability to care for the child, mother's intellectual limitations and Felicia's CT Page 4309-OO special needs, including the fact that she was developmentally delayed.
When Susan Wax received this case in 1989, the concerns she inherited from the previous social worker included mother's not showing good judgment, poor supervision during visits and mother's continuing to associate with individuals who could present risks to the child. She was not cooperating with a social worker in the Department of Mental Retardation, she would frequently lose her temper and, at the time, there were concerns, albeit never substantiated, that mother might be using drugs. Mother became more attentive to her child over time, but the other concerns, particularly those surrounding her temper and her associations, persisted.
One of Ms. Wax's other clients, a man named Robert Forand, had given the Department the respondent's name and address as his place of residence. Forand was known to DCYS as a child abuser. This proved only to be the first of many of mother's associations with undesirable individuals whose CT Page 4309-PP presence in her home posed a danger to her children.
For example, on January 28, 1990, Wax discussed with mother her concerns about one Earl Fowler, who was known to the Department as a person who had abused a child in the past. Mother minimized the nature of beg contact with Fowler. On April 20, 1990, Wax met with mother and her landlady and learned that there were numerous males frequenting the premises. They were often noisy, and the landlady was threatening to evict respondent. Mother's response was that "Earl sends" these people, and Wax tried to impress upon her that it was her right and obligation to refuse them entry. On May 30, 1990, mother had asked if Michael Sears could come to live at the apartment, despite the knowledge that Sears was involved in another DCYS case that resulted in a child's removal from its home. Wax advised against such a move, and mother said that she wouldn't let Sears move in, but he in fact did come to stay for a two-week period. The Department considered Sears to be "a known child abuser."
Wax saw frequent exhibitions of mother's explosive CT Page 4309-QQ temper, during which mother would yell, turn or walk away from those with whom she was in conversation. Wax was concerned that this anger could be unleashed on her child, especially since Felicia herself was prone to tantrums. Felicia had delayed language, bowel and bladder problems that could very well be sources of frustration that could trigger mother's anger, and treatment plans therefore focused on trying to curb her anger.
Additional meetings with Wax focused on mother's associations, including meetings on June 20, 1990 and on July 16, 1990, when mother revealed that she was seeing a man named "Izzy" who had just been released from a jail sentence that was in part based on his having earlier broken windows in mother's apartment. On July 20, 1990, mother requested overnight visits with Felicia, and when this was denied because of her continuing association with undesirables, she exploded in anger. There were additional discussions about Izzy on July 25, 1990, and Wax met with him and referred him to AA and counseling after learning that Izzy had been at mother's home while intoxicated. CT Page 4309-RR
On August 29 and 31, 1990, Wax received more reports of Earl Fowler's having been at mother's home. The neighbors were frightened by people coming to the house and being noisy. Mother's response was that it "is not my fault that they come to the house."
On September 13, 1990, mother went to ABC Counseling for anger control. She was angry about attending because the counseling was not court-ordered, but Wax told her that although not court-ordered, it was a good idea. She eventually did follow through on counseling for about three months.
On September 19, 1990, Wax introduced mother to a parent aide worker. Mother was enraged over this effort and again denied that any undesirable men had been in her home during the summer.
The parent aide assigned to mother was Diana Page. In a report to DCYS on January 15, 1991, Page said that she CT Page 4309-SS was impressed with mother's interactions with Felicia. However, this was based on a single visit, on January 7, 1991. When Page attempted another visit on January 14, there was no one home, and mother subsequently decided that she wanted no more such visits.
There were no reports of problems or undesirable men in the home from September through December of 1990, during which time DCYS began to consider a trial reunification. There had been some successful unsupervised home visits, and mother was permitting a "foster grandparent" and the VNA to help her. However, the anger control counseling had lapsed by then, with the counselor noting that mother had not shown much insight during her counseling. In the meantime, mother had become pregnant with Janelle. Stipulations and a service agreement were signed, and the reunification effort began on December 17, 1990. Karen E, who had been Felicia's foster mother from April through December of 1990, provided some parent training for mother.
Although this effort went reasonably well, the VNA CT Page 4309-TT did express concern about mother's anger and frustration and its fear that mother might hit Felicia. As the birth of Janelle grew nearer, mother asked that Felicia go into foster care on a voluntary basis when Janelle was born for a brief period of time so that mother could concentrate on Janelle. This was accomplished, and Felicia was soon returned home.
On May 13, 1991, however, there was a complaint that mother had left the baby alone with three-and-a-half year old Felicia. Mother acknowledged that this happened, but claimed that it was only for a few minutes. She did acknowledge that Felicia had picked up the baby, then only one month old, and was walking up the stairs with her. Mother was actually proud of this "accomplishment," but ultimately agreed to a DCYS service agreement regarding supervision for Janelle.
In June of 1991, mother wanted to move into a new apartment in a neighborhood considered undesirable by DCYS. During this discussion, mother grew angry and handled Janelle roughly as her anger grew. CT Page 4309-UU
On July 10, 1991, the mother came to DCYS distraught and crying. She admitted having left Felicia alone in a car to go into a building for a few minutes. She verbalized her fear of losing her child and said she would not do it again.
The following week, DCYS learned that there had been a fight at mother's apartment on July 5, 1991, at which a drunken male was arrested for exposing himself in front of the apartment. Felicia was there during that time.
In a discussion on July 23, 1991, respondent at first denied to Wax that Earl Fowler had been back at the apartment, but when her own mother said that he in fact had been there, mother did not dispute this account.
On August 5, 1991, mother told Wax that neither Fowler nor any other undesirable male would be coming to the house anymore because the landlord had made it clear that she would be evicted if they did. There was no reference by CT Page 4309-VV mother to the effect of these individuals on the children, only on her possible eviction. In fact, she consistently denied throughout the history of this case that the presence of these individuals posed any risk to the children.
By the time Wax turned the case over to Carol Sharp in September of 1991, she felt that there had been some progress, especially regarding cooperation with service providers, taking the children for medical care and getting Felicia to attend school. Mother and Felicia were showing signs of attachment to each other. At the same time, however, Wax remained concerned about mother's associations and she still felt that supervision of the children was an issue. Additionally, she felt that mother's anger had not been well controlled. Throughout the period of her involvement with this case, Wax was meeting with mother an average of once every two weeks, which in itself is a measure of the high level of her concern over mother's ability to parent effectively. Indeed, a termination of parental rights petition had been filed regarding Felicia in August of 1989, but it was withdrawn in April of 1990. CT Page 4309-WW
In 1991, after two extensions of commitment, DCYS sought revocation of the commitment and filed an accompanying social study. (Respondent's Exhibit 1). The report indicates that DCYS was encouraged by the progress of the trial reunification beginning in late 1990 and that there had been no major problems during it. Mother was providing reasonable day-to-day basic care, although she was not bathing the child regularly. The Department was not without reservations, however, and it sought protective supervision rather than outright revocation. The Department remained concerned about mother's strong need for male companions in the home and the fact that most of these companions were of the sort who could put a child at risk. They were either destructive or had a past history of physically or sexually abusing children.
Carol Sharp was assigned to the case in October of 1991, just after Felicia's status had been changed from commitment to protective supervision. Her goal was to help mother maintain a home for Felicia so that DCYS could CT Page 4309-XX eventually close its case. She discussed the Department's expectations with mother at their first meeting on October 9, 1991. On October 11, she met Peter Signorino, whom mother announced she was going to marry in three weeks. Sharp expressed her concerns about the rapidity of their courtship, but the marriage took place on November 2, 1991.
The balance of that year was uneventful, but on January 13, 1992, Sharp learned of the children's emergency removal from the home following an incident the day before that brought Janelle to Hartford Hospital with serious injuries. DCYS assumed temporary custody of both children, and, on January 31, 1992, when they were discharged from Hartford Hospital, they were each placed in separate foster homes. Janelle's first foster placement was changed in May of 1992 because the foster mother had become ill. Both children remain in foster care.
Sharp has had to deal with two major and serious issues throughout her involvement with this case. The first was mother's outbursts of anger. Sharp described numerous CT Page 4309-YY examples of these outbursts, which are generally characterized by mother's losing control, yelling, screaming, swearing, storming away and making inappropriate comments, such as that DCYS could "take the kids" or that Sharp should "just get them adopted".
More serious was the continued presence in mother's life off men whom DCYS considered inappropriate. In one instance, mother had asked whether her friend Melva's boyfriend, Bob Carnivale, who was just getting out of jail on child molesting charges, could come to her home to visit. Sharp told her that he could not but felt that this episode might have actually represented some progress in that at least mother had asked for permission first. Despite that, however, mother later permitted Carnivale, at a minimum, to move some boxes into her apartment. Sharp also found a note taped to mother's door from a man named "Ron" indicating that he had stopped by to visit, and, on April 9, 1992, during an unannounced visit, Sharp found a man named Walter Przekop in the home seated on the couch with Felicia asleep next to him. Mother gave different accounts of Walter's presence, neither CT Page 4309-ZZ of which were satisfactory in that mother had not, as she had promised, ever sought prior approval.
Sharp also described a number of other less serious but inappropriate actions on mother's part, including her inattentiveness to Felicia, being unduly upset at her, using inappropriate language in Felicia's presence and ignoring Felicia when Janelle was present. In and of themselves, these improprieties would not be a cause for alarm. Taken together and in the context of mother's other failings as a parent, however, they help to complete a portrait of a woman who has proved utterly unable to rehabilitate herself to the point where she could play a reasonably positive role in the life of her children.
Even since the filing of the termination petition, Carol Sharp has seen mother in the presence of Earl Fowler, a known child abuser about whom mother has been warned. She has come to DCYS offices twice in the company of Walter Przekop and has also twice come to DCYS offices with other men unknown to Ms. Sharp and not previously discussed with CT Page 4309-AAA the Department by the respondent. Additionally, Ms. Sharp has called the home on two occasions on which the telephone was answered by an unknown male voice. The respondent has been seen with Bob Carnivale, the boyfriend of mother's friend, Melva Vocatura, who had previously been convicted for exposing himself to Felicia. Ms. Sharp had told mother that it was not appropriate for her to be associated with him, and this is therefore yet another example of mother's unfortunate penchant for surrounding herself with altogether the wrong sorts of persons.
The precipitating event that led that to the filing of the instant petitions for termination of parental rights was the admission of Janelle to Hartford Hospital on January 12, 1992. David Swett, a DCYS Care Line worker who responded to that hospital after Janelle was transferred there from Backus Hospital with a fractured skull and other injuries, spoke to the pediatrician on duty, to mother, and to mother's friend Melva Vocatura. He also saw the child, observing a variety of bruises, scrapes and scratches. In interviewing mother, she was unable to give an explanation and said she CT Page 4309-BBB had never observed any of these bruises before, including those that were clearly older. She said she had left the child alone with the stepfather, whom she staunchly defended, saying that he would not do such things to a child. She noted that the child had been to a doctor recently for an ear infection on January 10, 1992, and again on January 11, 1992, for vomiting, and that she had been placed on a fruit/cereal diet. After returning home after leaving the child alone with the stepfather for a time, she saw that something was wrong and insisted on taking the child to the hospital. She said that her husband did not want her to take Janelle to the hospital. Mr. Swett placed a 96-hour hold on the child.
Daniel G. Fisher, M.D., a pediatrician in the Pediatric Critical Care Program at Hartford Hospital, was the admitting physician for Janelle, and he supervised the residents who cared for her. A CT Scan showed a skull fracture consistent with a significant head injury. If accidental, it could only be from a highly significant accidental injury, such as a high speed car crash, a fall from ten feet or more or being struck with a baseball bat. CT Page 4309-CCC It was Dr. Fisher's opinion that if the child was being swung by her feet and accidentally let fly for a distance of about five feet, this might have caused such injuries, but if so, it would have also caused significant and noticeable injury, including pain and crying. Simply picking the child up by its feet and dropping her would not have caused the injuries Janelle sustained.
At that time, the respondent gave Fisher no history consistent with these injuries, and, in fact, she gave no history of significant injury at all.
Dr. Fisher also described numerous visible injuries on the child's face. A scab on the bridge of the nose and a bruise under the left eye were older than a bruise behind the ear and the brain injury. The bruise behind the ear is associated with head injury (internal bleeding) and could have been temporally related to the brain injury. The hemorrhaging was recent, that is, within 48 hours prior to her admission.
Dr. Fisher described additional significant CT Page 4309-DDD injuries to Janelle. There was bruising on the buttocks and an injury to the anus that had to have occurred within the past one or two days prior to admission. The anal sphincter tone was extremely loose. Babies tend to have tight tone, and this combination of loose tone plus the bruising was highly suggestive of penetration. There was no explanation for these injuries other than sexual abuse.
Detective William Bundy of the Norwich Police Department was assigned to investigate the injuries to Janelle. He interviewed mother briefly at Hartford Hospital on January 13th and again on January 14 at the Norwich Police Department. He also interviewed her on May 13, 1992.
He obtained no information at the January 13th interview, but on January 14, mother told him that while the baby was downstairs, she had called upstairs to her husband that the baby was ill and was "limp and lifeless." She said that they then brought the baby to the hospital. She described visits to Janelle's doctor during the days prior to the hospital admission because of vomiting and an ear CT Page 4309-EEE infection.
On May 13th, following contact with mother, Bundy interviewed her again at police headquarters in Norwich. He had undertaken this final interview because the injuries described were inconsistent with the accounts that had been previously given. He did not threaten mother, nor did anyone else threaten her; she came willingly and voluntarily.
Mother arrived with her friend, Melva Vocatura, at around 1:00 o'clock in the afternoon. Bundy interviewed Ms. Vocatura first while mother waited. Ms. Vocatura had no new information to offer.
Bundy's interview with mother began at around 3:00 p. m. After explaining what the police had learned in their investigation and some of the inconsistencies they had uncovered, mother eventually told him that she was with the baby by herself with the baby sitting in a car seat in the apartment. She picked up the baby, suspending her by her feet and swinging her around. She lost her grip and the baby CT Page 4309-FFF was tossed outward about five feet, landing on the floor. Mother then became emotional and started to cry. At this time, about 4:40 p. m., Bundy advised her of her Miranda rights, which she indicated she understood. Bundy then reduced her comments to a written statement, which mother signed under oath. After she finished signing it, at approximately 5:40 p. m., she left police headquarters. She was free to leave at any time, according to Bundy, and, in fact, she did leave with Ms. Vocatura at the conclusion of the interview.
Karen R, Felicia's foster mother, testified that during the brief period in January following Janelle's birth when she had Felicia in foster care, Felicia gained about three pounds. When Felicia was returned to Ms. R, care in mid-April of 1992, she had already lost the weight she had gained during her first stay. Ms. Rs', observations of mother's weekly visits with Felicia and some of the joint visits with Felicia and Janelle were instructive. These included frequent shouting matches between mother and daughter, occasional periods of pouting CT Page 4309-GGG and refusing to speak to Felicia, substantial periods of time spent charting with the "foster grandmother", rather than interacting with her child, name calling, "playful hitting" and inappropriate commentary (e.g. "better not tell the doctor that I hit you. I never hit you. If you tell the doctor that, they won't let you come back to mommy"; "I won't come to visit you next week"; "I'll call Karen and then you'll be in trouble.")
Even more problematic than her interrelationship with Felicia is mother's interrelationship with the two children together during weekly joint visits. This is a volatile mix, and mother seems unable to make these visits work smoothly.
In May 1992, Ms. R, had taken Felicia, two other foster children and her own daughter to the mall when they unexpectedly ran into mother. Felicia clung to the foster mother and showed no interest in mother. Mother's friend Melva Vocatura was there too, and Felicia would have nothing to do with her. There was another incident in which CT Page 4309-HHH she also reacted negatively to seeing Ms. Vocatura and would not leave the foster mother's van. Felicia usually does react favorably to seeing mother, however, at least for a while.
Most visits with Felicia take place in the park during summer and in the library during winter. Mother has attended these visits faithfully, and Felicia often runs up and embraces mother at the beginning of the visit. She calls mother "mommy Kathy" and wants to call the foster mother "mom," but foster mother insists on being called "Aunt Karen."
The respondent usually reserves her limited interaction with Felicia for the end of the visit, when she "pumps Felicia up" about how much they will miss each other, wanting her to come home and cautioning her not to cry, even though Felicia is showing no sign whatsoever of being about to cry. The couple of times that Felicia has cried, she stopped as soon as mother left. Felicia does not ask to see Janelle at all. CT Page 4309-III
Mother has provided toys on occasion and has talked to her lawyer about increasing visits. Mother has also brought clothing, usually dirty and the wrong size or otherwise inappropriate. (She once brought a French bikini far more suitable to a young woman.) The foster grandmother attends most of these visits, and mother's sister has joined them on a couple of occasions.
Mother once volunteered an explanation of Janelle's injuries to Ms. R. She said that she was holding her upside down when she slipped and fell on her head. Felicia was present during this account. The respondent said she was afraid to tell DCYS because she would not be believed. More significantly, mother told Ms. R that she had once seen Peter Signorino standing by Janelle's bed with his penis exposed, pulling his pants up. This court finds it highly significant that mother never told this to DCYS or to the police. Despite having witnessed this ominous event, she did nothing to protect her children.
Ms. R also testified that in August of 1992, CT Page 4309-JJJ she saw Felicia attempting to insert a brush between the legs of a doll with which she had been playing. Felicia told Ms. R that she was doing this because "it feels good". In late October of 1992, Felicia pointed to her vagina and stated that "Peter kissed me there . . ." The testimony did not make clear whether Ms. R brought these actions to the attention of the respondent or anyone else.
This court finds that the sexual abuse sustained by Janelle was perpetrated by Peter Signorino.[3]
This court also finds it far more probable that Janelle's head injuries were sustained at the hands of Mr. Signorino than at those of the respondent. Although this court does not believe that mother inflicted serious injuries upon her daughter, however, the court finds it appalling that despite all kinds of warnings about inappropriate men in general and Peter Signorino in particular, she failed to protect her children.
Based in considerable part on the testimony and reports of Dr. Bruce Freedman, a clinical psychologist and experienced evaluator in family cases, as well as the CT Page 4309-KKK testimony of other witnesses, including the respondent, and observations of her demeanor, the court finds that the respondent is mildly retarded. That fact in and of itself does not mean that mother could not function as a parent, even with limitations. Against that backdrop of mild retardation, however, mother's inability to cope with her own psychological issues ultimately renders her incapable of parenting at least these two children, both of whom have highly specialized needs.
The respondent lacks the skills basic to child care, family life, and judging the character of others. Without these skills, she does not even know when she needs to seek help and advice. She is virtually certain to make mistakes, perhaps major ones, if placed in charge of her children.
Perhaps the best example of her failings is her utter inability to comply with the requirement and expectation that men not be allowed in her home without prior DCYS approval. She knows full well that she violated this CT Page 4309-LLL expectation, demonstrating that psychologically, she is unable to conform her conduct to the reasonable requirements placed upon her. She is passive with men and attracted to them, especially the wrong ones. She is easily confused and is able to be talked into things that, intellectually, she knows that she should not do. She tends to put off requirements that are distasteful to her, including the requirement that she avoid men not approved by DCYS. Dr. Freedman, who, in his first report, recommended continued efforts to reunify the family, ultimately, in his second report, recommended termination. The principal reason for revising his opinion was his conclusion that mother is simply incapable of separating herself from the dangerous men who continually enter her life.
Additionally, at the time of his first report, Dr. Freedman generally felt the respondent to be a credible person. He no longer feels this way, and he also believes that mother had some role in the physical abuse of Janelle, either active or passive.
On the latter issue, this court is satisfied that CT Page 4309-MMM mother played a passive role in Janelle's sexual abuse. Against the backdrop of all the concern expressed to her by DCYS and others about the threats presented to her children by inappropriate men, and given her reported observations of Peter Signorino at Janelle's bedside with his penis exposed, it is clear that she has utterly failed to protect her daughter from such abuse. It is also clear that she could have and should have protected her.
Establishing the cause of Janelle's head injuries is a more perplexing problem. Having heard and decided the battle over whether or not mother's statement of responsibility for those injuries should be suppressed, the court now finds itself in a quandary as to what to make of the "confession" whose suppression was sought. Considering all the circumstances about which the court received testimony, including the nature of the injuries themselves, physicians' interpretations of their causation, the time period between the injuries and the mother's statement of responsibility to police, and the court's assessment of the respondent's credibility and mental capacity, the court does CT Page 4309-NNN not find clear and convincing proof that Janelle's head injuries were caused in the manner described by mother. Janelle's injuries were simply too severe to have been caused accidentally in the manner described by her, and one would have to believe that mother, in her statement to police, had grossly understated her own actions in order to believe that it was in fact she, and not someone else, who caused the injuries. Whatever her other faults, however, and they are numerous, no evidence has been presented to suggest that mother would intentionally, or even in anger, do what would have had to have been done to inflict these most serious injuries.
It is not necessary, however, to determine who caused Janelle's injuries as a prerequisite to the termination of mother's parental rights. The fact that Janelle's injuries occurred while in mother's care and while mother was under an order of protective supervision relating to her other daughter, combined with mother's inability to provide any explanation consistent with those injuries or even to acknowledge the possibility that her then husband, CT Page 4309-OOO Peter Signorino, might have caused them, casts grave doubts on her ability to parent.
On balance, then, mother's attempt to claim responsibility, albeit accidental, for Janelle's injuries is a non-factor in the resolution of this case. The court does not find her "admission" to be clear and convincing, but there is ample independent evidence to support granting the petition without it.
An important consideration for Dr. Freedman, in recommending the termination of mother's parental rights, as well as for this court in rendering its decision, is the fact that both children do have special needs which render them especially difficult to care for. Felicia is a moderate-trainable mentally retarded child, which means that she is "significantly impaired", in Dr. Freedman's words. She was "off the bottom of the scales" on many testing areas, and the chances of her being able to live independently later in life are not good. It was Dr. Freedman's opinion that the fact that she is now being taught sign language is reflective CT Page 4309-PPP of her school's assessment that this may be the only way for her to communicate effectively, given the limitation of her language skills. She has limited emotional skills as well. She has a case manager at the Department of Mental Retardation. She is small for her age, with serious speech problems. She has a high energy level, throws tantrums frequently, and is difficult to control even by responsible adults. Her functioning is far below that of a normal six-year-old, and she is in a full-day special education program.
Many individuals in the moderate to trainable range of retardation can maintain some sort of semi-independence as adults. Having a good and stable home during her childhood may make the difference between Felicia's being able to live in some kind of a "sheltered setting" as an adult and having to be institutionalized when she grows up.
Janelle has been seriously damaged by her head injuries. She receives physical therapy and speech therapy. She is also on daily medication. Additionally, she is being CT Page 4309-QQQ seen by an opthalmologist [ophthalmologist] for her vision problems. The full extent of her disabilities cannot yet be determined.
With her intellectual and psychological limitations, mother is simply incapable of parenting either of these children with special needs. Parenting both of them would be out of the question for her.
The respondent offered testimony from several witnesses who were unable to overcome the clear and convincing evidence presented by the petitioner as to mother's failure to rehabilitate as well as her acts of commission and/or omission regarding Janelle. For example, Melva Vocatura, who has known the respondent for over five years and has stayed with her from time to time, offered an account of the events of January 12, 1992, the day of Janelle's injuries. She had been staying with the respondent and her husband, Peter Signorino, and had done some errands that day. Upon her return, Peter said that the baby had been throwing up and suggested taking the child to the doctor, CT Page 4309-RRR which they did. The doctor suggested changing her formula, but later in the day, the baby was much worse. As Peter was holding the baby, it went limp. He handed the baby to Ms. Vocatura, who called mother. Although Vocatura urged taking the baby to the hospital, mother called her own mother first for advice. Peter, in the meantime, was trying to get the respondent simply to put the baby to bed and was now angry at Ms. Vocatura for trying to persuade the respondent to take the child to the hospital. As to the scrape on the child's nose, Vocatura noticed it when they returned from shopping earlier in the day, but mother shared that it had been like that before.
Ms. Vocatura described the relationship between the respondent and her husband as characterized by frequent arguments. She said mother did not leave the child alone with him frequently, in part because he had been taking medication that tended to make him sleepy. She acknowledged that the respondent is also subject to temper tantrums.
Prior to taking the child to the hospital, she CT Page 4309-SSS heard the respondent arguing with her husband and saying "if you did anything to my baby, I'll kill you". To her knowledge, Peter is the only man with whom respondent ever left Janelle. Following the incident, mother separated from Peter and has not lived with him since.
Ms. Vocatura also testified that following her visit with mother to the Norwich Police Department on May 13, mother told her that she had told the officer that she had been swinging the baby by her arms and that the baby had dropped, thus causing her injuries.
Margaret Simon, the "foster grandparent", testified on mother's behalf but shed little light. She acknowledged that she and mother spend a lot of time sitting on a couch talking during visits with the children, although she denied that mother spends much of the visit time watching television. She suggested that mother was "doing a little better" in her parenting since she became involved as a foster grandparent, but she offered no specifics.
Denise Beplat, a counselor with ABC Counseling in CT Page 4309-TTT Norwich, testified as to her counseling efforts with the respondent. She testified that mother has been cooperative and has attended her sessions reasonably regularly with the exception of sessions missed because of illness or court appearances. At their first session, Felicia was present, and she thought that the interaction between mother and daughter was good. She feels mother is learning how to take care of herself, including knowing how to keep others, particularly the wrong men, from becoming too intrusive in her life. Her appearance and attitude about herself have improved and she now has obtained employment, a positive sign. She has also made progress in working on acceptable ways of expressing her anger. It was Beplat's opinion that, with proper support and services, mother might be able to assume a role as a responsible parent within a year or so.
The respondent's sister, Geri S, testified that she has attended several visits with Felicia, bringing her own children to these visits. She has not seen Janelle very frequently. She feels that mother has made progress and is assuming a more interactive role with Felicia at these CT Page 4309-UUU visits.
The respondent also testified as a witness in her own behalf. She described her upbringing and the birth of her two children. She claims to have been cooperative with all the services provided to her by DCYS, a claim which was convincingly refuted by the petitioner's witnesses. She also claims that she cares deeply about her children and that she has visited with them whenever she is allowed to, no matter what the obstacles. On this issue, the court finds her testimony altogether credible. She does care about her daughters and has probably done the best that she could to be a good parent to them. She consistently sought increased visitation, including overnight and unsupervised visits, which have been denied.
Mother pointed out that, recognizing her own limitations, she voluntarily asked that Felicia be placed in a foster home for a few weeks so that she could devote her full attention to Janelle when she was born. The Department complied, and Felicia was returned shortly thereafter. This CT Page 4309-VVV action suggests some degree of insight and forethought on her part. Beyond that, however, her explanations regarding her associations with undesirable men fall far short of undermining the Department's clear and convincing evidence that she is not capable of refraining from such associations in the future. For example, her explanation for the presence of Walter Przekop in her home in April of 1992, that Przekop was simply there to help her look for a lost wallet, strains credulity in light of the testimony of Carol Sharp that upon her arrival, Przekop was seated on the couch with Felicia asleep beside him.
Mother testified as to the circumstances leading up to her interview with Detective Bundy. As discussed in the section of this opinion dealing with the respondent's Motion to Suppress, the court did not find her version of the event to be credible, and the court did not feel that her statement to Bundy was anything other than voluntary.
As to the subject matter of that interview, as well as her present version of what occurred on January 12, 1992, CT Page 4309-WWW the respondent exercised her right not to testify on this issue at trial.
Although parents in child protection proceedings are given the right not to testify, see Connecticut Practice Book 1046, it does not necessarily follow that, as in a criminal case, an adverse inference may not be drawn against a respondent who exercises that right. Such an adverse inference may be drawn by witnesses' refusal to testify in a civil proceeding. Baxter v. Palmigiano, 96 S.Ct. 1551
(1976). That case appears to limit the extent to which such an inference may be drawn to the extent that existing facts already support an adverse decision, where no criminal proceedings are pending and where the witness was notified that silence could be used against him or her. In Olin Corporation v. Castells, 180 Conn. 49 (1980), our Supreme Court permitted such an inference from a civil defendant's refusal to answer deposition questions relative to a claim of fraudulent advance. See also Pavlinko v. Yale New Haven Hospital, 192 Conn. 138 (1984).
It is worthy of note that, although this court was CT Page 4309-XXX advised that criminal proceedings against the respondent were pending at the time of the termination trial, Superior Court for Juvenile Matters proceedings are confidential and the mother's testimony would not have been available to the prosecuting authority in the criminal prosecution.
Based on the foregoing, this court finds that an adverse inference could be drawn against the respondent because of her failure to testify on this issue. For the reasons previously stated, however, it declines to do so. Mother's decision not to testify about the events of January 12 might suggest that she is hiding her personal involvement in Janelle's injuries, that she knows more about Peter Signorino's involvement than she has previously indicated or that for reasons that perhaps she does not even well understand, she simply does not want to talk about it. No matter what the explanation, her silence adds little to the fact pattern that has already been well developed by the petitioner, and even if the court knew which adverse inference to draw, it does not need to do so in order to find the petitioner's principal allegations proved by clear and CT Page 4309-YYY convincing evidence.
In her testimony, mother acknowledged that she does not feel that she can care for both children without some assistance, but she does believe that with continued counseling and services, she will learn to be able to do so. As previously indicated, her counselor feels that she is correct in this belief, but that it will take another year or so to come to fruition.
On cross-examination, mother essentially denied every negative report of her conduct related by social workers Wax and Sharp. Some of those reports, such as her being advised that certain of the men she was associating with were known sexual abusers and that she had left Janelle alone once with Felicia, are so well documented that her adamant denial of them casts doubt on the rest of her testimony as well. It was also clear to the court from her demeanor that she still has difficulty curbing her anger and that her temper can quickly rise to the surface if she feels herself under stress. Mother is not malicious in her CT Page 4309-ZZZ inconsistency and her untruthfulness. Her tendency is simply to express as fact that which she wishes to believe is fact.
IV. Adjudication of Neglect Petition Re: Felicia
The first step in resolving the petitions regarding Felicia is to address the existing neglect petition for which an adjudication has already been made. As previously noted, that adjudication resulted in a disposition of protective supervision. The petitioner, who has temporary custody of Felicia, has moved to reopen that disposition and to modify it by converting it to a commitment.
By her own testimony, the respondent has stated that she is not capable of parenting Felicia on her own, although she feels that with additional time and services, she would be in a position to do so. Even without her testimony, however, the respondent has demonstrated by at least a fair preponderance of the evidence that, in the absence of the termination of parental petition, commitment to the Department would be in the child's best interest. The CT Page 4309-AAAA basis for this conclusion will be discussed at greater length in the sections of this opinion regarding the adjudication and disposition of the termination of parental rights petition regarding Felicia. Entertaining the petitioner's motion to reopen and modify the disposition of the existing neglect petition, however, would be relevant only if the petition to terminate parental rights is not granted. Because the court finds that the petitioner has sustained its burden with regard to the termination of parental rights to Felicia, modifying the existing disposition is a moot issue.
 V. Adjudication of the Termination of Parental Rights Petition Re: Felicia
A. Failure to Rehabilitate
Personal rehabilitation means "the restoration of a parent of his or her former constructive and useful as a parent." In re Migdalia N., 6 Conn. App. 194, 203,504 A.2d 533 (1986), cert. denied 119 Conn. 809, 508 A.2d 772. The statute requires the court to analyze the level of the CT Page 4309-BBBB parents' rehabilitation as it relates to the particular child. In re Luis C., 210 Conn. 157, 167 (1989). The reasonableness of the time period within which rehabilitation is sought to be accomplished is a question of fact for the court. In re Davon M., 16 Conn. App. 693, 695-6 (1988).
For nearly five years, from the original commitment through the filing of the instant termination petition, the petitioner and her agents have worked tirelessly to help the respondent cease her inappropriate associations with men who present a risk to her children, to curb her explosive temper and to provide her with a suitable level of parenting skills. For the reasons set forth in the Findings of Fact, this court concludes that despite these efforts, the petitioner has established by clear and convincing evidence that the respondent has failed to rehabilitate herself. Although the respondent's counselor, Ms. Beplat, felt that mother could rehabilitate herself with additional time, this court believes both that Ms. Beplat is incorrect and that even if she were correct, the time frame within which she feels that rehabilitation could be accomplished would not be reasonable CT Page 4309-CCCC under all the circumstances.
The court further finds that this ground has existed for a period of not less than one year from the date of the filing of the petition.
 VI. Adjudication of the Termination of Parental Rights Petition Re: Janelle
A. Failure to Rehabilitate
Many of the same considerations and evidence that compelled a finding that mother had failed to rehabilitate herself with respect to Felicia also apply to Janelle and compel the same conclusion. The fact that mother's failure to rehabilitate regarding Janelle date from the time of Janelle's commitment to the Department and therefore existed for less than one year as of the date of the filing of this petition, however, require that the court consider whether a waiver of the one year requirement is in Janelle's best interest before deciding whether or not to grant the petition CT Page 4309-DDDD to terminate parental rights. See Sections VII and VIII of this Memorandum of Decision, infra.
B. Act or Acts of Commission or Omission
As indicated in the discussion contained within Section III of this Memorandum of Decision, Findings of Fact, this court does not find proved by fair and convincing evidence mother's direct involvement in the infliction of the serious injuries sustained by Janelle on or about January 12, 1992. The court does find, however, that the petitioner has proved by clear and convincing evidence a variety of other acts of both commission and omission that have the effect of denying Janelle the care, guidance or control necessary for her physical, educational, moral or emotional well being. In particular, mother's continuing associations with dangerous men have had precisely that effect. More specifically, and most significantly, however, mother's failure to protect Janelle from such men, and particularly from Peter Signorino, is an act of omission of such monumental proportions and such devastating outcome that this omission alone would justify CT Page 4309-EEEE the conclusion that her parental rights to Janelle should be terminated.
In In re: Juvenile Appeal, 3 Conn. App. 184, 191
(1985), the Appellate Court recognized that: "The young age of the children and the fact that their mistreatment occurred in the privacy of the family home demand that proof of one parent's failure to halt the mistreatment perpetrated by the other must rest largely upon circumstantial evidence." The nature of Janelle's injuries, the manner in which they have to have been inflicted, evidence about Peter Signorino and his prior indecent exposure to his stepdaughter, his eventual conviction on risk of injury and reckless endangerment charges, in the absence of any other plausible explanation for Janelle's injuries all compel the conclusion that mother failed to prevent injuries to Janelle that should have been and could have been prevented. See also In re: Mark C.,28 Conn. App. 247 (1992).
C. No Ongoing Parent-Child Relationship
Our Supreme Court has construed the statutory CT Page 4309-FFFF language regarding "ongoing parent-child relationship" to contemplate "a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence, it has now been completely displaced. In either case, the ultimate question is whether the child has no present memories or feelings for the natural parent." In re Juvenile Appeal (Anonymous), 181 Conn. 638, 436 A.2d 290
(1980), citing with approval In re Juvenile Appeal, 177 Conn. 648
(1979).
The Appellate Court has confirmed that the statute contemplates the lack of an ongoing positive relationship between parent and child. In re Juvenile Appeal (84-6),2 Conn. App. 705, 483, A.2d 1101, cert. denied, 195 Conn. 801,47 A.2d 504 (1984). Our Supreme Court has acknowledged, however, that the statute "is inherently ambiguous when applied to noncustodial parents who must maintain their relationships with their children through visitation." In re: Valerie D., 223 Conn. 492 (1992). CT Page 4309-GGGG
There was ample testimony in this case that mother has faithfully visited with Janelle as often as the Department would permit and some evidence of recognition of mother by Janelle. Although the quality of those visits left much to be desired, this court concludes that mother has made sincere efforts to maintain a parent-child relationship with Janelle.
The court therefore concludes that the petitioner has failed to prove by clear and convincing evidence that there is no ongoing parent-child relationship between Janelle and her mother.
VII. One-Year Requirement
Because the grounds for termination relating to Felicia, namely failure to rehabilitate, relate back to the date of the original 1987 commitment, the court finds that the petitioner has proved by clear and convincing evidence that those grounds have existed for longer than one year. CT Page 4309-HHHH
As to the grounds which the petitioner has proven for termination of mother's parental rights to Janelle, namely failure to rehabilitate and act or acts of commission or omission, the petitioner concedes that those grounds have existed for less than one year, and the court so finds. Petitioner, however, alleges that it is in the best interest of Janelle to waive the one-year requirement. Waiver of the requirement is a matter of discretion before the trial court. In re: Romance M., 30 Conn. App. 839, 858 (1993).
The court agrees with petitioner that the one year requirement should be waived. Because the decision to waive the requirement is bound up in the consideration of the child's best interest, it is discussed in detail in the section of this Memorandum of Decision dealing with the best interests of the children, infra.
VIII. Best Interests
Having found by clear and convincing evidence that CT Page 4309-IIII statutory grounds alleged by the petitioner for the termination of mother's parental rights with regard to both Felicia and Janelle have been proved, the court has considered each of the six enumerated criteria of Connecticut General Statutes 17a-112 (d) and makes the following findings regarding the best interests of the children:
 (1) The timeliness, nature and extent of services offered to or provided to the parent and the child by the agency to facilitate the reunion:
Regarding Felicia, mother has been offered services by DCYS from the beginning of its involvement in 1987. Of more immediate relevance, a parent aide was provided in 1990, as was assistance from the Visiting Nurse Association. Parenting assistance was provided by Karen E and referrals were made to ABC Counseling. A foster grandparent was provided, and, after lengthy foster care, an attempted reunification occurred with Felicia in 1991. The Department CT Page 4309-JJJJ also provided respite for Felicia during the period surrounding Janelle's birth. Services were also provided by the Department of Mental Retardation and the WIC (Women, Infants, Children) Program, and the Department's social workers provided extremely careful attention to this family.
Janelle was also the beneficiary of the foster grandparent program as well as the "Birth to Three" program, the Early Intervention Program of the Department of Mental Retardation, speech, physical and occupational therapy and regular frequent visits with the mother, some of which included Felicia.
 (2) Court orders: The terms of any applicable court order entered into and agreed by any individual or agency and the parent and the extent to which all parties have fulfilled their obligations under such order.
Most significantly, mother has utterly failed to abide by court-ordered expectations, including those CT Page 4309-KKKK personally conveyed to her in open court by Judge Teller concerning her associations with inappropriate men.
 (3) Feelings and emotional ties of the child with respect to her parents, any guardian of her person and any person who will exercise physical care, custody or control for the child for at least one year and with whom the child has developed significant emotional ties.
Although both children recognize their mother and display some degree of affection toward her, neither child can be said to have a close emotional tie with mother. Both children appear to be closer to their foster mothers, despite the apparent effort of both foster mothers to make it clear that the respondent is their biological mother.
(4) Age of the children:
Felicia was born on December 29, 1986. Janelle was CT Page 4309-LLLL born on April 16, 1991.
 (5) Efforts to adjust: The effort the parent has made to adjust circumstances, conduct or conditions to make it in the best interests of the child to return her to her home in the foreseeable future, including but not limited to the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent provided the court may give weight to incidental visitations, communications or contributions and the maintenance of regular contact or communications with the guardian or other custodian of the child.
In fits and starts, mother has made efforts to adjust her circumstances, conduct and conditions. She has CT Page 4309-MMMM occasionally accepted services, has made efforts at counseling and has tried to learn to be a better parent. She has certainly maintained as much contact with her children as the Department would allow, attending visits unfailingly. The most important adjustment she was asked to make, however, was to disassociate herself from men who could pose a risk to her children. This failure has resulted in serious physical injury to one of her children.
 (6) Interference with relationships: The extent to which the parent has been prevented from maintaining a meaningful relationship by the unreasonable acts or conduct of the other parent of the child or the unreasonable acts of any other person or by economic circumstances of the parent.
The court received no evidence of any unreasonable interference of mother's relationship with her children. Although mother is clearly not a wealthy woman, the court CT Page 4309-NNNN heard no evidence that her economic situation was an obstacle to obtaining any of the services that could have improved her prospect for reunification with her children.
A review of these particularized findings, as well as a review of the evidence taken as a whole, persuades this court that it is in Janelle's best interest that the one year requirement be waived. This court sees no reasonable prospect that mother will find herself in a position to maintain a meaningful relationship with Janelle in the foreseeable future. Janelle is a young girl with serious injuries and special needs, and prompt permanent planning for her is essential.
The court thus finds by clear and convincing evidence that it is in the best interests of both children that the respondent's parental rights to them be terminated.
Having reached this painful conclusion, the court nonetheless feels obliged to note that it has observed the respondent with great care over the course of six days of CT Page 4309-OOOO trial as well as at several preliminary hearings. She was quiet and appeared attentive throughout the trial, sometimes smiling faintly for reasons that were not clear to the court. Her famed temper surfaced only once, during the course of arguments over whether she could be compelled to testify concerning the contents of her statement to Detective Bundy and/or the events of January 12, 1992. It was this court's distinct impression that mother is not a malicious or evil person and that she cares very much for her children. The court has no doubt that she will be crushed by its decision.
Nevertheless, the court is at least equally convinced that as a result of her psychological and emotional makeup, factors over which she has been able to exert little or no control, she is incapable of being a parent to her children. Therefore, despite its sympathy for a young woman who may very well be trying to do the best she can with what she has, this court has no choice but to terminate her parental rights.
IX. CONCLUSION CT Page 4309-PPPP
The petitions seeking the termination of mother's parental rights with respect to Felicia and Janelle are hereby granted, and judgments may therefore enter terminating Kathleen S.'s parental rights with respect to each of them. Pursuant to Connecticut General Statutes 17a-112 (f), it is further ordered that the Commissioner of the Department of Children and Youth Services be appointed statutory parent so that Janelle and Felicia may be placed in adoption. The statutory parent shall report to the court within ninety days on a case plan for the children and shall then submit reports at least every twelve months thereafter until such time as any proposed adoption plans have become final.
X. APPEAL
The respondent shall have twenty days from the date of this judgment in which to take an appeal. If she requests an appeal and her trial counsel is willing to represent her, this court will appoint him to act as appellate counsel at public expense until all appellate process is completed. CT Page 4309-QQQQ Practice Book Section 4017.
If, however, in the exercise of professional judgment as an officer of Superior Court, that attorney declines to prosecute such appeal because, in the attorney's opinion, it lacks merit, he is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the period in which to appeal to the maximum of forty days as permitted by law. Practice Book Section 4040. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The respondent will then be informed by the court clerk that she has the balance of the forty days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v. California, 372 U.S. 353
(1963); Fredericks v. Reincke, 152 Conn. 501 (1965).
Dated at Montville this 21st day of May 1993. CT Page 4309-RRRR
Jonathan E. Silbert, Judge