[Civ. No. 37731. First Dist., Div. Two. Aug. 19, 1976.]

In re ROBERT P., a Minor.
DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v.
JANICE P., Defendant and Appellant.

**COUNSEL**

William Gorenfeld, Robert Gibb, Dennis R. Hoptowit, George Forman and Raymond Cross for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg and Jamie Jacobs-May, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

TAYLOR, P. J.—Janice P., the mother, appeals from an order of the juvenile court depriving her of the custody of her minor son, Robert P., and declaring him to be a ward of the court, as a dependent child pursuant to the provisions of Welfare and Institutions Code section 600, subdivisions (b) and (d).[1] The appeal raises a question of first impression as to the proper evidentiary standard of review, and the necessity of findings in proceedings pursuant to section 600 juvenile proceedings; there are also issues concerning the application of the exclusionary rule, the quantum and sufficiency of the evidence, and the court's failure to make a finding that the award to a parent would be detrimental to the child pursuant to *In re B. G.,* 11 Cal.3d 679 [114 Cal.Rptr. 444, 523 P.2d 244]. For the reasons set forth below, we have concluded that the order of the juvenile court must be reversed for such a finding in accordance with this opinion.

Viewing the record most strongly in favor of the order of the juvenile court, as we must, the following pertinent facts were adduced at the detention hearing: Sometime in the late spring or early summer of 1973, the mother, Janice P., then a junior in high school, gave birth to a son, Robert. Janice P. was not married at the time nor has she ever been married. The child was conceived in a foster home to which Janice P. had been sent because of her alcoholic condition. Janice P. was not able to identify the father of the child as she was apparently too drunk at the time of conception. For six months after Robert was born, Janice P. lived with her father and stepmother,[2] Frances P. She then moved out with her son; thereafter, Janice P. and Robert returned to her father's home periodically whenever outside living conditions became too difficult for her to maintain. Frances P., Janice P.'s stepmother, testified that one of the residences maintained by Janice P. shortly after she left home was kept in a dirty and unsanitary manner and that during that time, Robert P. was poorly taken care of, often dirty and insufficiently fed.

---

[1] All subsequent references will be to the Welfare and Institutions Code unless otherwise specified. Section 600, so far as here pertinent, provides: "Any person under the age of 18 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge such person to be a dependent child of the court.

"(b) Who is destitute, or who is not provided with the necessities of life, or who is not provided with a home or suitable place of abode.

"(d) Whose home is an unfit place for him by reason of neglect, cruelty, depravity, or physical abuse of either of his parents, or of his guardian or other person in whose custody or care he is."

[2] Janice P.'s mother died when she was an infant.

In February of 1975, Janice P. and Robert rented a one-bedroom apartment at a motel. At that time, Janice P. was receiving state aid in the form of aid to families with dependent children (AFDC) ($212 per month); her rent at the motel was $70 every two weeks; she spent the remainder of her AFDC grant for food and laundry. At the time of the hearing in the instant matter in June 1975, Janice P. was living with a woman friend in Hopland and employed at a rancheria at $2.25 an hour.

During Janice P.'s residency at the motel, her stepbrother, Bill P., and her sister-in-law, Linda P. sometimes acted as babysitters for Robert at Janice P.'s request. Linda P. indicated that on several occasions, people with whom Janice P. had left Robert had grown tired of caring for him and had telephoned Linda P. to ask her to pick up and take care of the child.

In late April of 1975, Janice P. left Robert with Mary Mather, the manager of the motel. Ms. Mather understood that Janice P. would be back that same evening, but she did not return until the following evening. At some time during the first part of May 1975, after Robert had spent approximately 10 days with Linda P. and Frances P. and was then again back with Janice P. at the motel, Frances P. visited the motel apartment. This visit occurred when no one was home after Frances P. had heard and was shocked that Janice P. had taken Robert to a barroom. At this time, the apartment was "messy," smelled of wine and beer, and there were some empty wine bottles and 12 empty beer cans in it. Frances P. was angry at Janice P.'s drinking and the condition of the apartment; she asked Janice P. to let her take care of Robert until Janice got straightened out; Janice P. refused.

On the morning of Saturday, May 10, 1975, Janice P. left Robert with Brian C., the 17-year-old son of Ms. Mather. The next day, May 11, the motel manager called Linda P. and told her to come and take Robert because Ms. Mather could no longer care for the baby. Linda P., accompanied by a friend of Frances P. and the family, Geri Miller, went to the motel and took Robert. According to Ms. Miller, at that time, Janice P. had been gone for three days. Her apartment was in "awful" condition: the windows were broken, the curtains down, the bed frame was in disrepair; there was no food in the house, only molded food on the stove, and the apartment "stunk." Ms. Miller and Linda P. reported Janice P. to the police, and took Robert to the police station.

At approximately 7 p.m. that evening, Police Officer Frank Seward was called by the watch commander and introduced to Ms. Miller, Frances P. and Linda P., who had brought Robert with them. After talking with Ms. Miller, Officer Seward telephoned D. Strong, the supervisor of child protective services, who also talked to Ms. Miller. Strong requested that Robert be detained pursuant to section 600. Officer Seward then accompanied Linda P. and Ms. Miller to the motel to pick up some more clothing for Robert before he was placed in a foster care home.

We turn to the major questions on appeal concerning the sufficiency of the evidence, the proper standard of review, and the requisite findings pursuant to Welfare and Institutions Code section 600.

■ The mother first contends that the trial court's findings that she maintained an unfit dwelling pursuant to section 600, subdivision (b), and that she neglected her child (subd. (d)), are not supported by sufficient evidence. ■ The general rules regarding the test of sufficiency apply to dependency proceedings and if there is any substantial evidence to support the findings of a juvenile court, a court of review is without power to weigh or to evaluate the findings (*In re Schubert,* 153 Cal.App.2d 138 [313 P.2d 968]). All reasonable inferences to support the findings of the juvenile court must be made, and the record must be viewed in the light most favorable to the order of the juvenile court (*In re Luwanna S.,* 31 Cal.App.3d 112, 114 [107 Cal.Rptr. 62]).

■ Testimony at the hearing indicated that in Robert's short life: 1) Janice P. had moved several times; 2) she was periodically unable to maintain outside living conditions and returned to live with her parents; and 3) she kept at least two of her residences in an unsanitary condition. Sleeping provisions for Robert at the motel were poor, as he slept on a small baby mattress that lay on the floor and was pushed under a dresser during the day. Janice P. admitted that Robert did not often sleep on his mattress and would sleep with her most of the time "because he would wet it and didn't like the way it was." The apartment at the motel smelled of spoiled food; the only edible food in the apartment was an unopened can of condensed milk. Ms. Miller testified that the condition of the motel apartment was "awful" and that the interior of the apartment was in an almost total state of disrepair as the "windows were broken, the curtains were down and the windows were broken out and the bed was broken." Robert's grandmother, Frances P., described the

same apartment as messy with dirty clothes, a few cans and some empty wine bottles lying around; to her, the room smelled of beer, wine and spoiled food.

The record also indicates that Janice P. relied on others to take care of Robert P., and did not make adequate provisions for his care while she was away. On one occasion, Janice P. asked Ms. Mather, the manager of the motel, to watch her son. Although Ms. Mather believed Janice P. would return the same day, she did not return until the following evening. Janice P. also left Robert with Ms. Mather's two daughters for several days at a time. On one of those occasions, a daughter left the child outside unattended and crying.

On at least two or three occasions, Linda P., Janice P.'s sister-in-law, received calls from Ms. Mather or her family that they would not watch the baby any more. On those occasions, Linda P. took the child to her home, the last time on the weekend of May 9. Janice P., after leaving Robert with Ms. Mather's 17-year-old son on May 10, was gone for two days. At Ms. Mather's request, Linda P. and Geri Miller picked up Robert at the motel and on May 11 brought him to the police station.

It is clear that there is substantial evidence in the record to support the findings of the trial court that on May 9, 1975 Janice P. maintained an unsuitable place of abode under section 600, subdivision (b),[3] and that at that time in leaving the two-year-old Robert with the seventeen-year-old son of the motel manager for two days, she "neglected" her child under section 600, subdivision (d). We see no merit in the mother's contention based on *In re T. M. R.,* 41 Cal.App.3d 694 [116 Cal.Rptr. 292], and *In re Raya,* 255 Cal.App.2d 260 [63 Cal.Rptr. 252]. She further contends that the involuntary termination of the parent-child relationship is a drastic remedy that can properly be used in only extreme cases of neglect or abandonment.[4] While the fitness of the parent is determined as of the time of hearing and not necessarily determined by prior conduct (*In re Marriage of Russo,* 21 Cal.App.3d 72, 85 [98 Cal.Rptr. 501]), the court here was not required to disregard the pattern of the mother's conduct

---

[3]We are aware of *In re A. J.,* 274 Cal.App.2d 199 [78 Cal.Rptr. 880], wherein this court (Division Four, Christian, J.) reversed a finding made by the lower court, pursuant to subdivision (b), that the mother's cohabitation with a man who was not her husband was ipso facto evidence of depravity. *A. J.,* however, did not reach the question of vagueness and held (at p. 202) that the language of subdivision (b) that unfitness may exist by reason of neglect, cruelty, or depravity "limits and qualifies the term 'fitness'; . . . [but] does not create independent grounds for determining dependency."

[4]Abandonment is not in issue in this case.

for a substantial period before the hearing when Robert was frequently left in the care of others. Thus, under the ordinary and present standard of review, the evidence was sufficient.

However, our research discloses that since the filing of the briefs of the parties in the instant matter, a federal court, in a case of first impression, has determined that a parental termination statute requiring a mere preponderance of the evidence[5] was unconstitutional as a deprivation of procedural due process under the Fourteenth Amendment of the United States Constitution (*Alsager* v. *District Court of Polk Cty., Iowa* (S.D. Iowa 1975) 406 F.Supp. 10).[6]

Our Supreme Court has already intimated that *Alsager's* more stringent standard of clear and convincing evidence is to be applied to support a finding pursuant to a section 600 proceeding. In *In re B. G.*, 11 Cal.3d 679 [114 Cal.Rptr. 444, 523 P.2d 244], the court stated that in light of legislative history of Civil Code section 4600 and the policy of juvenile court law, as set forth in section 502, Civil Code section 4600 "permits the juvenile court to award custody to a nonparent against the claim of a parent only upon a *clear* showing that such an award is essential to avert harm to the child. A finding that such an award will promote the 'best

---

[5]This is the standard of proof also required for section 600 proceedings in this state pursuant to section 701. (*In re George S.*, 18 Cal.App.3d 788, 791-792 [96 Cal.Rptr. 203], so stated, applying the rationale of *In re Winship*, 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]; *In re Steven C.*, 9 Cal.App.3d 255, 263 [88 Cal.Rptr. 97].) The mother in her supplemental brief (at p. 4) concedes the application of the section 701 standard, but erroneously urges that the more stringent proof beyond a reasonable doubt standard, applicable to section 602, is appropriate here.

[6]At the oral argument on June 16, 1976, both parties were asked to provide this court with written comments concerning *Alsager* by June 21, and submission was deferred until that date. Both have done so in a most helpful and concise manner. The *Alsager* court (at pp. 18-19) expressed its concern over the dangers of vague custody standards and said at page 21: ". . . Due Process requires the state to clearly identify and define the evil from which the child needs protection and to specify what parental conduct so contributes to that evil that the state is justified in terminating the parent-child relationship." This court (Molinari, P. J.) held in 1974 in *In re J. T.*, 40 Cal.App.3d 633 [115 Cal.Rptr. 553], that although section 600, subdivision (a), was not unconstitutionally vague, the lower court's decision had to be reversed as the mother there was not given "meaningful notice" pursuant to the due process clauses of the federal and state Constitutions and section 656 that specifies the contents of a petition commencing dependency proceedings in the juvenile courts of this state. We cannot agree, however, with the People's argument that section 656, subdivision (f) cures any potential vagueness in section 600. *In re J. T., supra*, did not refer to section 656, subdivision (f), to save section 600, subdivision (a), from vagueness. We read section 656, subdivision (f), as a simple definition of an aspect of the duty to give meaningful notice. Subdivision (f) is silent as to the meaning of any of the terms used in section 600, and cannot do the "double duty" that the People urge in their additional brief.

interests' or the 'welfare' of the child will not suffice" (pp. 698-699; italics supplied).

The court continued at page 699: "In the present case, the trial court reasoned that it could weigh the advantages and disadvantages of an award to the mother and to the foster parents, and that a slight tipping of the scales in favor of an award to the foster parents would justify the denial to the mother of the custody of her children. As we interpret section 4600, this mode of reasoning is erroneous." ▇ While in *In re B. G.,* our Supreme Court was not explicitly dealing with the proper standard of proof to be applied pursuant to a section 600 proceeding, the language quoted above is susceptible to the reasonable interpretation that clear and convincing evidence is the proper standard of proof, pursuant to both section 600 and Civil Code section 4600.

While the facts of *Alsager* and the precise statutory language involved are substantially similar to the instant proceedings, there are several material distinctions. In Iowa, the parent-child relationship can be *permanently* terminated by the state for reasons similar to those set forth in section 600, while in this state, dependency hearings do not permanently sever the parent-child relationship. Pursuant to section 729, every hearing in which an order is made adjudging a minor to be dependent pursuant to section 600, and every subsequent hearing in which such an order is made, except a hearing resulting in the termination of the court's jurisdiction, must be continued to a specific future date not more than one year after the date of such order.[7] The record indicates that the order in the instant case was continued for its first annual review to May 18, 1976. At the subsequent hearings, the court determines the need for continued wardship (6 Witkin, Summary of Cal. Law (8th ed.) Parent and Child, § 347, p. 4852). In *Alsager,* however, "[t]he Court's ruling goes only to state action which *permanently* destroys the family unit, not to a temporary physical separation for the protection of the child." (See fn. 3 at p. 16.) Thus, section 600 proceedings in this state are somewhat less drastic and final in nature than those involved in *Alsager, supra.* While the Iowa statute does not provide for notice and a due process hearing, ours does. Also, in this state, indigent parents are entitled to free counsel (*In re Simeth,* 40 Cal.App.3d 982 [115 Cal.Rptr. 617]) and dependency proceedings are given priority on the appellate calendar (§ 800).

[7]Although the statutory provision so specifying was enacted in 1961 (Stats. 1961, ch. 1616, § 2, p. 3486), the current recommendations of the Judicial Council calling for the establishment of procedures for the annual review, indicate that it has perhaps not been as frequently or well implemented as the Legislature intended (see Supreme Court press release No. 59, dated May 14, 1976).

Regardless of these distinctions, we feel that the general language of both *Alsager* and *In re B. G.* requires us to apply the standard of "clear and convincing," rather than "preponderance of the evidence." ■ However, we conclude that there is ample evidence to meet the more stringent standard in the instant case.

The mother argues that section 600, like the similar statute in *Alsager,* is subject to the same constitutional attacks successfully made in *Alsager* on the basis of vagueness and overbreadth. She points out that section 600, like the Iowa statute, is vague and unspecific in the use of certain terms, such as "destitute," "necessities of life," "suitable place of abode," and "unfit place by reason of neglect." It is arguable that these terms, like the term "messy," are insufficiently descriptive to give one fair warning of proscribed conduct and fail to inform one whether the applicable uniform standard is that of a middle class home or of a home under similarly deprived economic circumstances and lack of other resources as the one in the instant case.[8] Nor does it seem logically possible that all minors supported only by ADC can be classified as "destitute," pursuant to section 600, for then all children supported solely by ADC potentially could be adjudged dependent. ■ However, we think that any potential vagueness and overbreadth of section 600, subdivisions (b) and (d) here in issue, have been cured in *In re B. G., supra,* which holds that Civil Code section 4600 is applicable to all custody proceedings, thus including those undertaken by a juvenile court pursuant to section 600.[9]

---

[8]As this court noted in *In re A. J., supra,* at page 202: "The unfitness of a home for a particular child is a relative concept. It cannot be determined except by a judicious appraisal of all available evidence bearing on the child's best interests including, in this case, a consideration of the doubtful proposition that a foster home or institutional placement is likely to be more fit for a 13-year-old boy than a home with his own mother even though her marital arrangement is irregular." Similar reasoning applies here and we note that the trial court commented that the mother had a good relationship with Robert P. and the social worker indicated that Robert P. was a normal two-year-old in every way.

[9]The People rely on *American Civil Liberties Union* v. *Board of Education,* 59 Cal.2d 203 [28 Cal.Rptr. 700, 379 P.2d 4], to argue that subdivisions (b) and (d) of section 600 here in issue, are not vague. While that case set forth the standard to be used in determining vagueness as to statutes defining crimes, our Supreme Court applied a different test, and stated at page 220, that whether "a particular statute is or is not too broad in the constitutional sense turns not so much on its language as upon its effect." The United States Supreme Court, in *Rose* v. *Locke,* 423 U.S. 48 [46 L.Ed.2d 185, 96 S.Ct, 243], clearly indicated that greater specificity is required where a statute threatens a fundamental right than where a criminal statute punished conduct not amounting to the exercise of a fundamental right (fn. 3 at p. 50 [46 L.Ed.2d at p. 188, 96 S.Ct. at p. 244], citing *Smith* v. *Goguen,* 415 U.S. 566 [39 L.Ed.2d 605, 94 S.Ct. 1242]). The right to the custody of one's own children, free from unwarranted state interference, has long been

■   We turn next to the mother's contention that the court failed to make the necessary finding required pursuant to section 600 under the holding of *In re B. G., supra,* that Civil Code section 4600 requires the court to make a finding that an award of custody to the parent would be detrimental to the child before custody could be awarded to a nonparent. We agree. Clearly, no such finding was made here and it is required by our Supreme Court and in the holding in *Alsager.*

■   We now turn to the question of whether the exclusionary rule is applicable in the instant case and thus whether the court properly admitted Officer Seward's testimony and the photographs of the apartment.[10]

The record indicates that in substantial duplication of the evidence of the other witnesses concerning the condition of Janice P.'s apartment, Officer Seward testified that when he arrived, Ms. Miller and Linda P. had entered Janice P.'s apartment and had left the door open.[11] As Seward approached, he detected a strong odor of spoiled food. He entered, noting the clutter and litter in the apartment, including dirty clothing, some phonograph records and magazines and at least one soda can lying on the floor. Seward took three photographs of the interior of the apartment showing: 1) an adult-sized bed which was in a broken-down condition; 2) a child's mattress lying on the floor; and 3) a pot on the rear of the stove in the kitchen. Seward testified that the pot on the stove contained beans that were beginning to mold. When he conducted a search of the whole apartment unit, besides the beans, the only food he found was an unopened can of condensed milk in the refrigerator.[12]

recognized as a fundamental right (*Stanley* v. *Illinois,* 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208]; *Meyer* v. *Nebraska,* 262 U.S. 390 [67 L.Ed. 1042, 43 S.Ct. 625, 29 A.L.R. 1446]; *Cleaver* v. *Wilcox* (9th Cir. 1974) 499 F.2d 940). Also pertinent is the recent case of *In re Welfare of May* (1976) 14 Wn.App. 765 [545 P.2d 25], holding that the custody rights of a 15-year-old mother could not be abridged where, according to the experts, the mother, despite her history of running away from home, truancy and shoplifting, had a chance to develop into a good parent. The facts of the Washington case and the instant case are striking, as here the "normal" condition of Robert P., his mother's good relationship, and her improved status at the time of the hearing, were not controverted.

[10] The issue was raised but not reached by the Second District in *In re Dawn O.,* 58 Cal.App.3d 160, 163 [128 Cal.Rptr. 852].

[11] The record is unclear as to whether Seward and the two women came together or separately and how much time, if any, elapsed between their entry of the apartment and his. The most reasonable inference from the record is that they arrived almost simultaneously but in separate vehicles so that only a few minutes elapsed between the entry into the apartment of the two women followed by Seward.

[12] Certainly, the beans on the stove and condition of the apartment were in plain view. The opening of closet doors and drawers, the logical location of the child's clothing, is

Prior to and during the detention hearing, the mother objected to the introduction of the photographs and moved to strike Seward's testimony on grounds of an unlawful search and seizure. The court, without stating any specific reasons, denied the prehearing motions, overruled all of the objections, and admitted the photographs into evidence. The mother argues that the exclusionary rule applies to section 600 dependency proceedings.

Recently, in *Emslie* v. *State Bar,* 11 Cal.3d 210 [113 Cal.Rptr. 175, 520 P.2d 991], our Supreme Court found that practically no deterrent effect on any law enforcement officer would result if an exclusionary rule were applied to attorney disciplinary proceedings. After giving consideration to the social consequences of applying the exclusionary rules and the effect thereof on the integrity of the judicial process, the court held the exclusionary rules of criminal law inapplicable to State Bar disciplinary proceedings. Subsequently, our sister court in the Second District held the rule not applicable in *Governing Board* v. *Metcalf,* 36 Cal.App.3d 546 [111 Cal.Rptr. 724], a statutory proceeding concerning the dismissal of a teacher for "moral unfitness," after criminal proceedings that established, pursuant to illegally obtained evidence, that the teacher had engaged in an act of oral copulation in a public restroom in a downtown department store. The court concluded that the special protection afforded children by law justified the result.

The application of the exclusionary rule, primarily in criminal cases, may be necessary to insure that the law enforcement officers observe the proscriptions of the Fourth Amendment. However, we are mindful that just dispositions are frequently thwarted thereby and we see no necessity to extend the rule to the relatively few violations in child custody actions which are not criminal in nature. The possibility that such an extension might result in the suffering or deprivation of innocent children is too high a price to pay for any slight additional deterrent effect.

The order is reversed with directions to the trial court to make the necessary finding in accordance with the views expressed in this opinion.

Kane, J., and Rouse, J., concurred.

A petition for a rehearing was denied September 17, 1976, and appellant's petition for a hearing by the Supreme Court was denied October 28, 1976.

reasonable. The general search of the rest of the apartment, however, is questionable. Arguably, although the opening of the refrigerator door was not reasonable under the circumstances of looking for clothing, the fact that the only food found was condensed milk, on its face food for the child, is a fact that enures to the benefit of the mother.