Filed 11/13/13  In re Benjamin S. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re BENJAMIN S., a Person Coming Under the Juvenile Court Law. | B247164 (Los Angeles County Super. Ct. No. CK96444) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. HEIDI S., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Philip L. Soto, Judge.  Affirmed.

Carlson & Greenberg, John E. Carlson for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Kimberly A. Roura, Deputy County Counsel, for Plaintiff and Respondent.

_____

Heidi S. challenges an order declaring her son a dependent of the juvenile court, arguing that "the evidence did not establish that [she] was a substance abuser, nor that she could not protect or provide for her son." She also challenges the disposition order because it lacks findings that the boy's health and safety cannot be assured unless he is removed from her custody. Substantial evidence supports dependency jurisdiction, and the court's failure to state findings during the disposition hearing is harmless error. We affirm.

## FACTS

Heidi S. (Mother) is the mother of Benjamin S., born in 2011. In November 2012, the police were summoned to a public park by concerned citizens who saw an intoxicated woman with a baby. The police were met by eyewitnesses who stated that they saw Mother drink beer and nearly drop the child as she stumbled around the park. Mother staggered over to speak to the police: her speech was slurred, she smelled of alcohol, her eyes were bloodshot, she swayed, and she could not find her belongings. Mother displayed two prescription drug containers and said that she drove her son to the park. The police determined that Mother was unable to take care of Benjamin or herself. She was arrested for child endangerment and Benjamin was taken into protective custody. Following her arrest, Mother registered a blood-alcohol level of .11 and .12 in two tests. After being *Mirandized*, Mother said she drank several beers and took two "Norcos" (a prescription narcotic) within a two-hour period.

An emergency referral was made to the Department of Children and Family Services (DCFS). A social worker determined that Mother and David H. (Father) share joint legal and physical custody of Benjamin under a family law order. Father met Mother only a month before she became pregnant. They are not in a relationship. He does not know whether Mother abuses alcohol or drugs, but described her as "erratic," sometimes friendly and sometimes hostile. She recently sent him "hundreds of hostile and threatening text messages" in two days. He has concerns about Mother's mental health due to her erratic behavior. Father is willing and able to care for the child, and he and Mother have a nanny for Benjamin. DCFS released Benjamin to Father's custody on

2

November 5, 2012. The officers who arrested Mother said that she admitted to driving under the influence and taking the painkiller Norco; they found Norco and Ambien (sleeping pills) in Mother's purse.

Mother was interviewed in jail. She did not remember what occurred when she was arrested, saying, "I just remember being very confused and out of it." She had a few beers at the park, and claimed that her friend "Tim" drove her there. She felt disoriented when the officers came to talk to her, believing that an antipsychotic medication she had taken the night before (Seroquel) was still having an effect on her 15 hours later. She uses Norco for pain relief. Mother understood that she made a terrible mistake by mixing alcohol with medication. She was suffering from postpartum depression, for which her physician prescribed Zoloft and Wellbutrin. Mother "feels safe and comfortable with the child being with the father" although she and the baby are bonded and she would like him to come home with her. She denied abusing drugs or alcohol, and promised to cooperate with DCFS to ensure Benjamin's safety.

Benjamin's nanny told the social worker that she has worked with the family for a year and has never seen any indication that Mother abuses alcohol, describing both parents as responsible and caring. One day after her initial interview with the social worker, Mother called to say that she had posted bail. She had very little memory of what she said to the social worker the day before. Mother now stated that she drove herself to the park with Benjamin: when they arrived, she developed a migraine, reached in her purse for Norco and by accident took Ambien, which caused confusion and amnesia. Mother does clinical research at UCLA. She admitted sending threatening text messages and saying terrible things to Father because she was angry.

Mother's psychiatrist, Dr. Genen, confirmed a diagnosis of postpartum depression, for which he prescribed two antidepressants, plus Seroquel and Ambien for insomnia. Ambien can cause temporary confusion and amnesia. Mother's behavior at the park seemed uncharacteristic to Dr. Genen, though he admittedly was unaware that Mother sent many threatening text messages to Father.

3

The social worker observed that Mother makes unreasonable demands for visitation, telling Father she would visit the child at his home for eight hours every day. Mother wanted Father to present a united front with her in court, which suggests that she is not taking responsibility for her actions and wants others to help her out of the situation she created. Father wants Mother to be with Benjamin, so long as there is certainty that the child is safe with her. The social worker feels Benjamin is at high risk in Mother's care due to her apparent overconsumption of prescription drugs and failure to appropriately supervise and care for her child.

On November 14, 2012, DCFS filed a petition on Benjamin's behalf, alleging that he is at risk of harm because (1) Mother placed Benjamin in a detrimental and endangering situation by becoming incoherent and confused in a public park under the influence of alcohol and prescription drugs, and (2) Mother is a current user of alcohol and prescription drugs, rendering her unable to provide regular care and supervision of Benjamin. The court found a prima facie case for detaining Benjamin from Mother and vested placement with DCFS, finding that "release to Father is appropriate." Mother was given three monitored visits per week.

DCFS filed its jurisdiction/disposition report on December 12, 2012. Benjamin is living with Father, who has no criminal history. Mother has a recent arrest for child endangerment; a 2007 DUI conviction that required completion of a three-month alcohol and drug program; and a conviction for theft in 2000 for which she was ordered to undergo psychological counseling. Under a family law judgment dating from April 2012, Mother had primary custody of Benjamin and Father had physical custody two days per week. The report repeats the circumstances leading to Mother's arrest and Benjamin's detention, when Mother was found intoxicated at a public park and admitted to police that she drank four beers and drove under the influence.

In an interview, Father opined that Mother has mental illness, perhaps borderline disorder, narcissism, or bipolar disorder. She does not take responsibility for her actions and always blames others; because she is unable to see that she has done something wrong, she is apt to repeat mistakes. He has had conversations with Mother in which

4

"her body [was] awake and her mind asleep" and she had no recollection of the conversation one day later. Mother regularly takes prescription drugs. Her story about the day of her arrest changed repeatedly. When Father asked her to take a hair follicle test, Mother volunteered that she has been "leaning more heavily" on the narcotic Norco for the last six months. She did not admit wrongdoing, but complained about Father and the supposed incompetence of the DCFS social worker.

Father is a musician and does voice work. He has a seven-year-old son from a marriage: he and his ex-wife have 50/50 custody of the boy. He met Mother online in 2010, and she became pregnant shortly after they met. They have an amicable relationship, and Father has been involved in Benjamin's life since birth. Father tested negative for drugs on December 5, 2012.

Mother was interviewed. She stated that she picked up Ambien, Vicodin and migraine medications at the pharmacy, then took Benjamin to the park. The last thing she remembers is getting a horrible headache. She reached for her medication and took Ambien instead of her migraine medication. After that, she was in a fog and only vaguely remembers the police talking to her. "Apparently I drank alcohol in the park. I have no idea how I drank alcohol. I have no idea what happened. I didn't take any alcohol to the park and I didn't talk to anyone in the park. I drove Benjamin to the park. When the police came to me, I was holding a beer can in the park around the children, drinking obviously." Mother blames herself for taking the wrong medication. She takes antidepressants; Xanax; Ambien (for insomnia); and Vicodin for her migraines. Mother had a seizure during the detention hearing and was taken to the hospital. The seizure was attributed to taking Zoloft and Wellbutrin, stress, and not eating. She described her conduct as "an honest mistake" and is willing to do everything necessary to regain custody. Mother tested negative for drugs on December 7, 2012.

In a letter, Dr. Genen stated that he has been treating Mother since September 2012, and does not believe she has a personality disorder, a psychotic disorder, bipolar disorder, or substance abuse problems. She has symptoms of anxiety and depression but continues to function at a very high level, excelling at her job and maintaining social

friendships. She is dedicated to Benjamin's welfare. He believes that Mother accidentally took Ambien, causing amnesia and bizarre, uncharacteristic behavior. He is forming a medication plan to redress Mother's symptoms, including insomnia. She uses antidepressants; she no longer uses Ambien and has discarded medications she is not currently taking in order to avoid any future mistakes. Dr. Genen does not believe that Mother would ever intentionally endanger Benjamin, and recommended that he be returned to Mother's care. Mother's friends and colleagues submitted letters attesting to her love for Benjamin.

DCFS recommended that the court sustain the petition. Mother initially told officers that she took two painkillers, drank alcohol, and drove Benjamin to the park. She showed the officers prescription drug containers. She tested above the legal blood alcohol limit after her arrest. Later, Mother changed her story and claimed mistaken use of a sleeping pill. Father has previously observed Mother take prescription medication, act bizarrely, and not remember past events. Mother admitted to Father that she was leaning heavily on painkillers for the last six months.

The jurisdiction hearing was held on December 14, 2012. At the outset, Mother's attorney indicated that "[w]e are not really concerned with jurisdiction with the DCFS. We are concerned about disposition more than anything. We have a plan that we think is reasonable which is in the best interest of the parties. So we would like the court to order DCFS to do a further investigation in regards to the mother's plan to see whether or not it's feasible." No argument was offered with respect to jurisdiction. The court sustained the allegations in the petition without amendment. Mother was ordered to have weekly random and on-demand drug and alcohol testing, and was authorized to have monitored visits three times per week for three hours per visit.

On January 3, 2013, the court issued a temporary restraining order against Mother, after she became hostile and uncooperative while retrieving Benjamin from Father's home, as Father was trying to tell her what Benjamin had eaten, whether he had a nap and where he was in his schedule. Father announced that he was cancelling the visit and began removing Benjamin from Mother's car. Mother began yelling and grabbed

6

Benjamin's legs, causing the child to cry. Father explained that it was not safe for Mother to take the child if she refused to hear about his basic needs. The maternal grandmother threatened to "sock" Father in the mouth. Mother called the police claiming that Father "assaulted" Benjamin. Father called the Child Abuse Hotline and was told not to worry because he had custody. When the police arrived, they told Mother to take Benjamin and leave, and they refused to take a criminal report. The police advised Father to take an independent witness when he went to collect Benjamin, and to have all future exchanges occur at a police station. Mother was barred from approaching Father's home or workplace.

A letter was submitted from Timothy Sanchez, who has known Mother since the seventh grade and has periodically shared a house with her. Sanchez obtained a restraining order against Mother in 2000, when she became unstable and irrational after he advised her that he was moving out. Sanchez lived with Mother from mid-September 2012 until the end of November 2012. He saw that she was "intoxicated" (drunk or medicated) daily, and was disoriented, tripping, falling and slurring, sometimes driving Benjamin in this state. According to Sanchez, Mother consumes as much as a 12-pack of beer every day. Sanchez twice caught her and Benjamin in his arms to prevent them from hitting the floor. He witnessed her give beer to Benjamin on a daily basis, which disrupted Benjamin's moods, sleep, and eating habits. Mother did not feed Benjamin regularly, and did not cook him meals, giving him only delicatessen meat and string cheese. On a day that Mother was ordered to drug screen, she asked Sanchez for his urine, but he refused. Mother regularly awakens with no memory of her behavior the night before, but refuses to accept that there is a problem. She told Sanchez that she planned to have Father killed, and would rather kill herself and Benjamin than allow Father to have full custody of the child. Mother repeatedly told Sanchez that she has been a physician since 1999 and is the chief of staff at UCLA's pediatric oncology department.[1] In fact, Mother does not have a medical license.

---

[1] Mother also told the police and a social worker that she is a physician.

The contested disposition hearing was held on January 25, 2013. Dr. Genen testified that Mother has been his patient for four months and has major depressive disorder. Her initial postpartum depression was exacerbated by other stressors, such as her tumultuous relationship with Father. Dr. Genen attributed Mother's seizure during the detention hearing to her use of the antidepressant Wellbutrin, and attributed her arrest to a bad reaction to the sleeping medication Ambien. Mother and Father indicated to the court that they have no intention of becoming a couple again. The court did not allow evidence showing whether Mother posed a threat to Benjamin because "I've got the child with the father."

The court placed Benjamin with Father. Mother was given referrals to licensed therapists and to a drug and alcohol program with weekly random testing. The court emphasized that it was not ordering Mother to complete any programs, but warned her that if she did not show satisfactory progress, she would not obtain custody in the future. The court made a "mutual no harm, annoy or molest order" and directed the parties to cooperate peacefully when Benjamin is going for visits. Mother was given monitored visitation. She appeals from the disposition. (Welf. & Inst. Code, § 395.)[2]

## DISCUSSION

### 1. Jurisdiction

Mother contends that the record does not support dependency jurisdiction. Reviewing jurisdictional findings, we see if substantial evidence, contradicted or uncontradicted, supports them. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) "'"In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

---

[2]    Statutory citations in this opinion are to the Welfare and Institutions Code.

Sustained findings under section 300, subdivision (b) require (1) neglectful conduct by the parent; (2) causation; and (3) a substantial risk of physical harm or illness.[3] (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.) "[P]roof of current risk of harm is not required to support the initial exercise of dependency jurisdiction under section 300, subdivision (b), which is satisfied by a showing that the child *has suffered* or there is a substantial risk that the child will suffer, serious physical harm or abuse." (*In re Adam D.* (2010) 183 Cal.App.4th 1250, 1261.) Evidence of past conduct may be used to establish dependency jurisdiction, to the extent that it is probative of current conditions. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1438; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394.) The juvenile court need not wait until the child is actually harmed before intervening. (*In re Eric B.* (1987) 189 Cal.App.3d 996, 1003.)

The courts afford special protection to "children of such tender years that the absence of adequate supervision and care poses an inherent risk to their physical health and safety." (*In re Rocco M.*, *supra*, 1 Cal.App.4th at p. 824.) While an older child may able to avoid physical danger and seek care from responsible adults if neglected by a parent, infancy is "an inherently hazardous period of life" with special vulnerability. (*Id.* at p. 825; *In re Drake M.* (2012) 211 Cal.App.4th 754, 767; *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1004 [11-year-old child could avoid the physical dangers that make infancy hazardous].) The primary concern is the child's best interests and the provision of a safe home free from the negative effects of substance abuse. (§ 300.2; *In re B.T.* (2011) 193 Cal.App.4th 685, 692.)

The evidence is sufficient to sustain dependency jurisdiction. Multiple concerned eyewitnesses contacted authorities because they saw Mother stumbling around a public park, drinking beer, and nearly dropping Benjamin. When the police arrived, Mother

---

[3] The court may exercise jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his [ ] parent [ ] to adequately supervise or protect the child . . . or by the inability of the parent [ ] to provide regular care for the child due to the parent's . . . substance abuse." (§ 300, subd. (b).)

staggered over to speak to them, smelling of alcohol and slurring her speech. Mother admitted to driving with Benjamin while under the influence of alcohol and painkillers, and testing showed she had a blood-alcohol level in excess of the legal limit for driving. Mother was arrested for child endangerment. In addition, the record shows that Mother pleaded no contest to criminal charges of driving under the influence in 2007. Both Father and Mother's former housemate observed that Mother is regularly unable to recall recent conversations, an observation borne out by Mother's inability to recall what she told the DCFS social worker from one day to the next.

The juvenile court could reasonably find that Mother is a substance abuser. As a medical researcher at a university, Mother must know the danger of mixing prescription painkillers or sleeping pills with alcohol. Yet she saw fit to take two painkillers and consume alcohol while driving and supervising Benjamin, at high risk to the child's safety. There is evidence that Mother suffers from amnesia as a result of her substance abuse. While admitting that she was "obviously" drinking in the park and was carrying a beer, she added, incongruously, "I have no idea what happened. I didn't take any alcohol to the park."

The court did not have to believe Mother's after-the-fact story that she mistook the sleeping pill Ambien for the painkiller Norco. Mother's story changed from moment to moment: she told the police she took two painkillers, she told the social worker she was suffering from the aftereffects of Seroquel taken 15 hours earlier, then she said she took Ambien by mistake. Either way, she mixed opiates and/or soporifics with alcohol, a combination that is well-known to be dangerous. The fact that Mother admittedly sent hundreds of angry, threatening messages to Father because she was annoyed with him suggests an ongoing substance problem, because it is not sober behavior.

DCFS sustained its burden of proof. First, it showed that Benjamin suffered a substantial risk of serious physical harm because Mother admittedly drove him while intoxicated and was seen nearly dropping him due to her state of intoxication. Mother could not possibly protect Benjamin from harm—such as toddling or crawling in front of traffic, or from abduction if she lost consciousness—by frequenting a public park while

10

not in control of her actions. Second, DCFS showed that Mother has a history of substance abuse that includes a DUI conviction and her recent arrest for endangering a child due to intoxication from alcohol and prescription drugs. Mother told Father that she leans heavily on Norco. Her use of drugs and alcohol causes blackouts or amnesia.

In cases involving children of tender years, "the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm." (*In re Drake M.*, *supra*, 211 Cal.App.4th at p. 767.) At the age of one, Benjamin required Mother's constant attention. Her conduct demonstrated that she was unable to provide him with an appropriate level of supervision and protection, negatively impacting her ability to parent.[4]

## 2. **Disposition**

A dependent child may not be removed from the physical custody of a parent with whom he resides unless the juvenile court finds, by clear and convincing evidence, that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's [ ] physical custody." (§ 361, subd. (c)(1).) DCFS concedes that the court failed to make findings under section 361.

The court should find that it would be detrimental to leave the child with the custodial parent, before awarding custody to the nonoffending parent. (*In re Robert P.* (1976) 61 Cal.App.3d 310, 320.) "However, cases involving a court's obligation to make findings regarding a minor's change of custody . . . have held the failure to do so will be deemed harmless where 'it is not reasonably probable such finding, if made, would have been in favor of continued parental custody.'" (*In re Jason L.* (1990) 222 Cal.App.3d

---

[4] Mother frankly conceded dependency jurisdiction at the outset, making no effort to challenge the allegations in the petition with evidence or argument, and indicating that her only concern was the disposition.

1206, 1218.) We may imply the facts from the record on appeal. (*In re Corienna G.* (1989) 213 Cal.App.3d 73, 83.)

Although the juvenile court did not make an express finding that Mother's custody poses a substantial danger to Benjamin's health, safety, protection and well-being, the court made it abundantly clear that it saw Mother as an unfit parent who could not have custody until she completed a drug and counseling program. During the disposition hearing, the court stated to Mother, "If you don't do a drug program, you know what? Then you don't. But I'm going to tell you this: if you don't do a drug program with the testing and demonstrate that everything is clean and you are doing your mental services with your doctor . . . and everything is working out with your meds and everything else, if all of that isn't cleared up by the time we come back in the middle of the summer, we are going to close this case out with a family law order [in] which we'll leave the baby with dad and just monitored visits with you, nothing more, unless and until you show that all of these things have been done."

Under the circumstances, remanding the case for the trial court to make findings under section 361 would be a meaningless exercise, because there is no reasonable probability that such a finding would have been in favor of giving Mother custody. Because the court refused to allow Mother to have unmonitored visits with Benjamin, there is no way that the court would have allowed Mother to retain custody. A threat to Benjamin's safety is implicit in the court's order that a third party must monitor all of Mother's visits.

There is more than sufficient evidence to support a finding that returning Benjamin to Mother's custody would pose a substantial risk of harm to the child. As described in the preceding section, Mother drove the child while intoxicated, drunkenly staggered around a park with a beer in hand, nearly dropping the child, causing members of the public to alert authorities that Benjamin was at risk of harm. Mother apparently intended to drive Benjamin home in a state of near blackout. She mixed alcohol with opiates and/or sleeping pills, yet denies that she misuses intoxicants. Her consumption of alcohol in the middle of the day, in public, while driving and supervising an infant,

12

disproves her claim that she is not a drinker. Mother's statement to the social worker that she did not take alcohol to the park on the day of her arrest defies belief, since Mother tested above the legal blood-alcohol level for driving.

As the juvenile court firmly advised Mother, she cannot take custody of Benjamin without proof that she is free of alcohol and other substances that impair her ability to provide a safe environment for a toddler. The juvenile court's failure to make formal findings is harmless error, because a finding that a danger to Benjamin exists is implicit in everything the court said to Mother during the hearing and is supported by substantial evidence.

## **DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

BOREN, P.J.

We concur:

ASHMANN-GERST, J.

CHAVEZ, J.

13