Filed 12/15/15  Danielle T. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DANIELLE T. et al., | |
| Petitioners, | |
| v. | |
| THE SUPERIOR COURT OF CONTRA COSTA COUNTY, | A146241 |
| Respondent; | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, et al., | (Contra Costa County Super. Ct. Nos. J14-00988, JI4-00989) |
| Real Parties in Interest. | |

Danielle T. is the mother of two minors—a male and an infant female—who were declared dependents of the juvenile court.  D.B. is the presumed father of the infant female.  At the conclusion of a contested six-month review hearing, the court ordered the termination of reunification services provided by real party in interest Contra Costa County Children and Family Services Bureau (Bureau).  The court also set a hearing pursuant to Welfare and Institutions Code section 366.26[1] at which parental rights might be terminated when the court selects a permanent plan for the minors.  Each parent has filed a petition for an extraordinary writ, as authorized by California Rules of Court, rule 8.452.  Danielle T. contends the court's finding that the services the Bureau did furnish to her were reasonable is not supported by substantial evidence, from which it

---

[1]Statutory references are to this Code.

1

follows it was error to terminate reunification services. D.B. contends there is no substantial evidence for the court's finding that he has failed to participate regularly and make substantial progress with his case plan.

The resolution of these contentions does not require a detailed recapitulation of the record. The juvenile court asserted jurisdiction when it sustained the following allegations of the petitions filed by the Bureau, detailing the reasons why the minors' conditions came within subdivisions (b) and (j) of section 300:

"The child's mother places the child at risk of serious physical harm by utilizing inappropriate physical discipline in that she 'whoops' the child with a cord on his stomach and shoulder."

"The child's sibling was physically abused by the child's mother when on or about September 11, 2014, she dragged the child's one year old sibling through a store, kicked the child's sibling and then violently yanked the child's sibling by her arm."

"The child's mother placed the child's sibling at serious risk of harm when on or about September 11, 2014, she left the child's one year old sibling unattended in a locked, hot car with the windows rolled up for approximately eight minutes."

At the unreported dispositional hearing held in February 2015, the court directed the Bureau to provide the reunification services specified in each parent's case plan. The court also set a six-month review hearing.

Two pertinent events occurred prior to that hearing. First, the court granted the request of the caregiver of the female minor D.B. for de facto parent status. Second, the Bureau moved, pursuant to section 388,[2] to terminate reunification services to both

---

[2]"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new or changed circumstances exist, and (2) the proposed change would promote the best interest of the child. [Citation.] The [moving party] bears the burden to show both ' "a legitimate change of circumstances" ' and that undoing the prior order would be in the best interest of the child. [Citation.] The petition is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion. [Citation.]" (*In re S.J.* (2008) 167 Cal.App.4th 953, 959–960.)

2

parents because: "The mother has failed to consistently participate in her case plan, including mental health services, substance abuse services and drug testing, and parenting. The father has not been in contact with the Bureau and has not participated in his case plan, including counseling, drug testing, and parenting." It was because "the failure of the parent to participate regularly and make substantive progress in their court-ordered case plan" "creates a substantial likelihood that reunification will not occur." The court ordered the Bureau's motion heard at the same time as the six-month status review.

That dual hearing was held on August 10 and September 3, 2015. Father was present at both, the mother at neither. Juliette Scott testified that she had been the caseworker since September of the previous year. Until July (the month before she testified in August), Scott had had only one conversation with the father and received only one e-mail from him since February. "[A]fter the last court hearing he started sending me e-mails in July that he had signed up for . . . drug testing." He failed a drug test on July 25. He told Scott he had completed an anger management course, but it was not acceptable because it was too brief, "just 4 hours long," not the 52-week course the Bureau wanted. According to Scott, the father "would not contact me," and "I was unable to get a hold of [him]." She was aware that the father had been hospitalized for four days after being stabbed in April—but this information did not come from the father, who never talked to Scott about the incident.

Scott further testified that the mother had completed a parenting course, but it also was too brief to satisfy the case plan requirement. The mother had missed only one visit with her daughter. Scott had not received "any other information about mother completing services."

The father's mother testified that she wanted to have the female minor placed with her. She spoke every day with the woman with whom the minor was placed. The father would visit with his daughter whenever she was at the paternal grandmother's, although the grandmother did not inform the caseworker about these visits. The paternal grandmother also did not tell the caseworker that she took care of her son while he stayed

3

at her house for about six weeks following his stabbing. She did not think her son has problems with domestic violence or controlling his temper. She believed her grandson had been coerced into expressing fear of his father.

The father testified concerning the stabbing. He explained why he had to enroll in an internet domestic violence class, and the communication difficulties with Scott. The e-mails he did receive, he replied to.

By the time the hearing resumed on September 3, the Bureau had provided the court with a status review report and a supplemental memorandum. In the memorandum, caseworker Scott recounted three intemperate exchanges with the mother. One message left on Scott's phone involved language that Scott—and the Bureau—interpreted as a threat of physical violence, and which persuaded the court to issue a restraining order. The Bureau advised the court that "the recent threats will necessitate the case being transferred to a different [case] worker."

The status review report already prepared by caseworker Scott advised the court: "On January 14, 2015, a clinical assessment was completed on mother. Per the assessment, 'mother stated that she did not want to raise her daughter, because she did not want to be a single parent all over again. Client stated that she blames her eight month old daughter and [the] father for the situation that she's in today. Client stated that she only had her daughter, because [the] father said he would marry her, but she only wants to be with her son. Client also stated that she gets irritated and angry easily.' "

According to Scott, "[mother] does not understand why she is involved with Children & Family Services. Mother appears to take no responsibility for her actions and stated it is untrue that she abused her daughter." Mother's "denial and minimizing of her anger issues create an unsafe environment for the children to be returned to her care."

Scott further reported that of 22 scheduled drug tests, mother had missed 19 and tested positive on the remaining three. Mother's therapist reported to Scott that mother attended seven sessions between January and April 2015, at which point the therapist lost contact with her. Mother signed up for parenting, domestic violence, and anger management classes, but completed none of them.

Scott's concluding assessment was that "Although it is clear that mother loves her children, she has been ambivalent toward engaging in her case plan services. Mother has failed to consistently participate in services that would allow her to attain the tools to control her angry outbursts and her impulsive behavior. Mother appears easily influenced by . . . [father], and it does not appear that [he] has mother's best interests in mind.

"Mother appears to have had difficulty staying on task with completing her case plan services. During this reporting period mother appeared to be undecided about where she wanted to participate in her case plan services. It appeared that mother was getting outside influence from [the] father . . . to get the case transferred to San Francisco . . . . Mother stated to the undersigned on more than one occasion that her marijuana levels were not going to lower because she was stressed and the loss of losing her grandmother had her feeling overwhelmed. At times during this reporting period, mother denied that she needed any outside help and stated she did not understand why she had to complete any services.

"[The male minor] has been exposed to many incidents of domestic violence, physical discipline, and has suffered from his mother's unpredictability. In the past, [he] has been a parentified child. [He] is thriving and able to be a child in the atmosphere provided by the paternal aunt. Furthermore, [the female minor] is thriving in the foster parent's home. . . . [The male minor's] paternal aunt and [the female minor's] foster parent have worked hard to provide opportunities for the children to spend time together. Both paternal aunt and foster parent have put a lot of effort into making sure the children maintain their relationships with their extended family members."

The father resumed his testimony on September 3. He acknowledged his case plan specified he participate in a drug treatment program, but that he had enrolled in such a program only "about three weeks ago." He had been drug tested seven times, and come up clean on six of them. The stabbing required a hospital stay of five days, but it "incapacitated" him for approximately two months, until the first week of June. He had visits with his daughter at his home during this period.

5

Scott testified briefly that she received no e-mails from the father from November 14, 2014 until July 26, 2015.

The female dependent's godmother testified that she was with the woman with whom the child had been placed. The father came up and asked the caregiver "Can I pay you so that you can stop coming up here [to court]? This can be just between me and you."

The court then heard argument. Counsel for the minors concurred with the Bureau seeking termination of services. Counsel for the father "ask[ed] that on the basis of his incapacity, that he be given . . . extra time" and reunification services.

The mother's counsel's argument, in its entirety was as follows: "I object to the recommendations of the [Bureau] terminating her services for both [minors]. Based on the records and the previous testimony, [the mother] has completed . . . services in different locations. And she has continued, prior to the latest memo, to maintain contact and visit with her children."

The court then ruled as follows:

"I'll start first with [the male minor's] case. I am going to grant the Department's 388 motion . . . . [¶] . . . [¶] As it relates to Mother and given her most recent conduct and the fact that although she has attended some classes and participated in some services—it's clear that that participation is without any substance whatsoever. And, in fact, there's a notation of her being disconnected during her parenting class.

"I do not believe it's appropriate to continue to offer reunification services because, given the state of the evidence, there's no indication that Mother has in any way meaningfully engaged in those services. So I'm going to terminate family reunification services to . . . Mother . . . and set that matter for a .26 hearing . . . .

"As it relates to [the female minor's] case, I have to say I found both the paternal grandmother and father's testimony to be very troubling, and, quite frankly, to be incredible, not believable, especially when Father gets up, after his mother has testified that he lived there to recover after this alleged carjacking and stabbing incident and now he testifies he didn't live there at all; he lived in San Francisco where he lives with his

son. Well, who took care of Dad in those months where he couldn't even leave the home if he lived there alone with an eight-year-old child. That really stretches the imagination.

"I understand why he might want to testify that way, because . . . Father living with his mother while the child was there was in direct violation of this Court's order. Nor is there any evidence . . . that Father or the paternal grandmother, and she admitted this much, ever let Ms. Scott know that Father had been injured and had to live with the paternal grandmother to be cared for.

"Ms. Scott's e-mails are clear that she had no such knowledge and had not heard from Father consistently. Father offers a couple of printed e-mails as evidence that he did indeed communicate with Ms. Scott. Number one, even assuming for a moment that he sent these e-mails, there's no evidence that they were received by Ms. Scott, and I found Ms. Scott to be credible in that testimony.

"Secondly, his one e-mail contradicts his claim that he was too incapacitated to participate in services. Father's [exhibit] F—he claims he sent on April 26th—specifically says, 'I've been working with my caseworker from Homeless Prenatal to complete the recommended services. I'm currently enrolled in parenting classes and complying with the referred drug testing.'

"He says he sent that on April 26th, and yet he testified here he couldn't do any of those things because he had just been stabbed, couldn't get out of bed, couldn't leave his home. And I don't find believable that he was incapacitated all the way until July and couldn't participate in services. If he could get out of bed and go see his doctor, there's no reason to think he couldn't get out of bed and go to a testing site and submit a sample.

"And he certainly has had the opportunity to bring forward medical evidence that his doctor told him he absolutely could not go and submit to drug testing or participate in classes. And he was released to work in June, and what does he do? He gets on the Internet in July to complete a four-hour class.

"In the Court's mind, this was a wake-up call that [the father], who has never, at least based on the evidence presented, taken this case seriously, never has been fully

7

committed to reunification with his daughter until the 11th hour—quite frankly, it was almost the 12th hour.  It was way too little, way too late.

"And the fact that he would follow the caregiver around in the hallways and offer her money to go away undercuts any commitment, quite frankly, any learning he's received through services.  I think he's learned nothing, nothing at all through the course of these proceedings.  It's rather outrageous behavior in the court hallway.

"And [the godmother], I found to be very credible in her testimony, unlike Father's testimony, which I did not believe, I did not find credible.  To the contrary, I found him to be very unbelievable.  Even assuming for a moment that Father was incapacitated for some period of time, by his own evidence, he wouldn't even be completed with a domestic violence program until mid November, which is well beyond 12 months.[3]  And yet he has demonstrated repeatedly a lack of judgment and a lack of ability to be a fit parent based on the conduct that's been testified to.

"I'm very troubled by this case, and I'm very troubled by Mother's behavior as well.  This child has been brought up in a household and abused.  Mother has made statements that the only reason why she kept the child is she thought it was a means to get back with Father.  She didn't even want this child.  She wanted her son but not her daughter.

"And the father, if he was so concerned—if the paternal families were so concerned about Mother's behavior, why on earth would the paternal grandmother allow the contact that she allowed in direct violation of this Court's order?  I can see no reason to extend this case to 12 months.  . . .  [T]he evidence is . . . that there is not a substantial likelihood that this child would be reunified with one of her parents by the 12-month mark, which I believe is . . . October 16th.

---

[3]This was an oblique reference to the usual maximum period for reunification services in a dependency—12 months.  (§ 361.5, subd. (a).)

"And the reason why it took so long to get to disposition is Father contested the recommendation, which is his right to do so, and then Mother had requested a continuance because they had discovery, which is her right to review the discovery.

"But Father, who claims he has no substance abuse problem, was stopped by police on February 1st and found to have cocaine in his pocket. And he . . . tested positive in these court proceedings. . . . after that date. Four days later, he comes before this Court, and he tests positive for cocaine and marijuana.

"So the evidence undercuts his claim that he is actively engaging in services to reunify. For those reasons and the reasons that I've stated with respect to Mother, I am going to adopt and incorporate the recommended findings into the Court's order here today, and I'm going to set [the female minor's] case for a .26 hearing as well."

## REVIEW

"The court may not order that a hearing pursuant to Section 366.26 be held unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent . . . ." (§ 366.21, subd. (g)(1)(C); see Cal. Rules of Court, rule 5.708(m).)

"[W]henever a child is removed from a parent's . . . custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother . . . ." (§ 361.5, subd. (a).) "It is difficult, if not impossible, to exaggerate the importance of reunification in the dependency system. With but few exceptions, whenever a minor is removed from parental custody, the juvenile court is required to provide services to the parent for the purpose of facilitating reunification of the family. [Citation.] Each reunification plan must be appropriate to the parent's circumstances. [Citations.] The plan should be specific and internally consistent, with the overall goal of resumption of a family relationship. [Citations.] The agency must make reasonable efforts to provide suitable services, 'in spite of the difficulties of doing so or the prospects of success.' [Citation.]" (*In re Luke L.* (1996) 44 Cal.App.4th 670, 678.)

"The adequacy of the reunification plan and of the department's efforts to provide suitable services is judged according to the circumstances of the particular case.

9

[Citations.] . . . '[T]he record should show that the supervising agency identified the problems . . . maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .' [Citations.]" (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1011.)

But the reunification services offered have only to be reasonable; perfection is not expected or required. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 425; *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.) "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) The reasonableness of reunification services is to be determined in light of all relevant circumstances, which include "the mental condition of the parent, her insight into the family's problems, and her willingness to accept and participate in appropriate services." (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.)

The reunification process is a collaborative effort. "Reunification services are voluntary, and cannot be forced on an unwilling or indifferent parent." (*In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1220.) "Once a parent has been located, it becomes the obligation of the parent to communicate with the [the social services agency] and participate in the reunification process." (*In re Raymond R.* (1994) 26 Cal.App.4th 436, 441.) If the parent believes that the reunification services are inadequate or misdirected, the parent cannot remain silent about such deficiencies during the reunification period, and then complain as the period is about to end, or raise the perceived deficiencies on appeal. (*Los Angeles County Dept. of Children etc. Services v. Superior Court* (1997) 60 Cal.App.4th 1088, 1092–1093; *In re Christina L., supra,* 3 Cal.App.4th 404, 416.)

"The requirement that reunification services be made available to help a parent overcome those problems which led to the dependency . . . is not a requirement that a social worker take the parent by the hand and escort him or her to and through classes or

10

counseling sessions.  A parent whose children have been adjudged dependents of the juvenile court is on notice of the conduct requiring such state intervention.  If such a parent in no way seeks to correct his or her own behavior or waits until the impetus of an impending court hearing to attempt to do so, the legislative purpose of providing safe and stable environments for children is not served by forcing the juvenile court to go 'on hold' while the parent makes another stab at compliance." (*In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5.)

The juvenile court is required to have clear and convincing evidence when it finds that the reunification services offered were adequate, but that finding is reviewed on appeal for substantial evidence.  (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971; *In re Maria S.* (2000) 82 Cal.App.4th 1032, 1039.)  The same is true for a finding under section 361.21, subdivision (e) that a parent failed to participate and make substantial progress with the case plan.  (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1341.)

An appellate court conducting an examination for substantial evidence has a very constrained scope of operation:  "The issue of sufficiency of the evidence in dependency cases is governed by the same rules that apply to other appeals.  If there is substantial evidence to support the findings of the juvenile court, we uphold those findings. [Citation.]  We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts.  Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion.  [Citation.]  The appellant has the burden of showing the finding or order is not supported by substantial evidence. [Citation.]" (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947; see *Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1346 [regarding a "reasonableness of services" finding].)

Consideration of these standards establishes that the mother cannot prevail with her contention that reasonable services were not provided.

She asserts that although her case plan "provided for a medical evaluation, one never took place. The plan also provided for a psychological examination. The mother's therapist accomplished this and raised issues of delusion and paranoia but there was no follow-up." "[F]urther investigation should have occurred to see if there was a specific cause and whether a specific services plan could be established." If by "medical evaluation" she means something other than "a psychological examination," she is mistaken, for the case plan specifies only a "Psychiatric/Psychological Evaluation." As for the lack of "follow-up," that may be academic, for there is no reason to believe that had additional and more specifically tailored services been offered, mother would have availed herself of them. In other words, had the Bureau offered services intended to alleviate "issues of delusion and paranoia," would not those services been treated with the same indifference, ambivalence, and incomprehension that mother extended to other services? In this context we pay special attention to the juvenile court's characterization of mother's participation in the services offered as "without any substance whatsoever."

The same conclusion applies to father's contention concerning the implied finding that he failed to participate regularly and failed to make substantive progress in achieving the objectives of the case plan. Little if anything of significance from his testimony survived the juvenile court's determinations as to his credibility, determinations that are conclusive here. Then there is his near total failure to keep in touch with caseworker Scott, as required by the case plan. Next is the court's conclusion that it was not until "almost the 12th hour" that he showed proof of becoming "fully committed to reunification with his daughter," to which must be added one of the findings proposed by the Bureau and adopted by the court: "[T]he extent of progress which the father has made towards alleviating or mitigating the causes necessitating [his daughter's] placement in foster care [was] none." Such a last minute change usually fails to impress a juvenile court (see *Cresse S. v. Superior Court* (1996) 50 Cal.App.4th 947, 954–955), and so it proved here. Father was told at the disposition hearing that his failure to participate regularly in reunification services might adversely affect his parental rights. (See § 361.5, subd. (a)(3).) Scott's testimony, and her written report, that he did not heed

12

this caution each constitutes substantial evidence. (*In re Malinda S*. (1990) 51 Cal.3d 368, 381; *In re Robert P*. (1976) 61 Cal.App.3d 310, 315.)

The petitions are denied on their merits, and this opinion is final forthwith. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)


_____

Richman, Acting P.J.


We concur:


_____

Stewart, J.


_____

Miller, J.